843 A.2d 915

Oscar Antonio LOPEZ–SANCHEZ

v.

STATE of Maryland.

No. 936, Sept. Term, 2003.

Court of Special Appeals of Maryland.

March 8, 2004.

582

Neil F. Quinter (McDermott, Will & Emery on the brief), Washington, DC, for Appellant.

Gloria Wilson Shelton (J. Joseph Curran, Jr., Atty. Gen. on the brief), Deborah S. Richardson (Stephen E. Harris, Public Defender on the brief), Baltimore, for Appellee.

Panel: DEBORAH S. EYLER, BARBERA, and GREENE,* JJ.

---

* Greene, J., now a member of the Court of Appeals, participated in the conference and decision of this case while a member of this Court; and participated in the adoption of this opinion as a member of this Court by special designation.

DEBORAH S. EYLER, Judge.

Oscar Antonio Lopez–Sanchez, the appellant, was a victim of a delinquent act by DeShawn C., in Howard County. In the delinquency case, the State and DeShawn agreed to a Consent Order for Restitution ("Consent Order"), by which DeShawn would reimburse the appellant for some medical expenses, but not for lost wages. A few days after the Consent Order was docketed, the appellant filed a motion to reconsider or, in the alternative, to alter or amend. The juvenile court held a hearing on the motion and thereafter issued a memorandum opinion and order denying it, on the ground that the appellant lacked standing.

The appellant filed an application for leave to appeal in this Court, which was granted. The State and DeShawn are participating as the appellees.

The appellant has posed six questions for review:

I. Did the juvenile court err in concluding that the victim lacks standing to assert his right to restitution from the respondent for the permanent, crippling injuries the respondent inflicted upon him?

A. Must a person be a party to have standing to assert rights in legal proceedings?

B. Does the Victims' Rights Act of 1997 give victims standing to seek restitution in juvenile proceedings?

II. Did the juvenile court improperly deny the victim's presumptive right to restitution for his lost earnings under Article 27, § 807 by approving the State and respondent's proposed order that contained no restitution for the victim's lost earnings?

III. Did the juvenile court err by holding that the State must join in the victim's request for restitution for lost earnings in order for the court to entertain the request?

IV. Did the juvenile court violate its mandatory duty under Article 27, § 781(d) to consider the victim impact statement in entering the judgment of restitution

by approving the State and respondent's proposed order without taking the victim's impact statement into account?

V. Did the juvenile court improperly deny the appellant his right under Article 27, § 780 to address the judge at a disposition hearing by signing the State and respondent's proposed order without hearing from the victim?

VI. Did the juvenile court improperly ignore the State's Attorney's Office's failure to provide the victim with a copy of the proposed "consent order" prior to its being submitted to, and signed by, the judge, in violation of the victim's right under Article 27, § 770 to receive prior notice of all court proceedings in the case?

DeShawn filed a motion to dismiss the appeal, on the ground that it is not permitted by law. The State then joined in that motion.

For the following reasons, we shall grant the motion to dismiss the appeal.

## FACTS AND PROCEEDINGS

In the early morning hours of February 29, 2000, in Columbia, Maryland, the appellant was returning home from work at a Wendy's restaurant when he was shot in the back. He sustained serious wounds that caused him to become permanently paralyzed from the chest down.

DeShawn, then age 16, was apprehended in connection with the shooting, and was charged in the Circuit Court for Howard County with attempted murder, first and second degree assault, reckless endangerment, attempted robbery, attempted robbery with a dangerous and deadly weapon, and use of a handgun in the commission of a felony.[1]

---

1. The attempted robbery and handgun charges were thereafter dismissed by the State.

■ The circuit court granted a reverse waiver motion and transferred the matter to the juvenile court.[2] On August 23, 2000, the State filed a petition for delinquency against DeShawn. DeShawn was placed by the Department of Juvenile Justice ("Department") at the Hickey School. In September 2000, the Department transferred DeShawn to Bowling Brook Academy ("Bowling Brook"), in lieu of other detention options. The Bowling Brook program was time-limited, with DeShawn's placement to last between 10 and 12 months.

An adjudicatory hearing before a juvenile master took place on October 25, 2000. Two days later, the master issued a report and recommendation, finding that DeShawn was involved in the shooting and had committed an act that in the adult criminal justice system would constitute the crimes of attempted murder, first degree assault, second degree assault, and reckless endangerment. The master made certain recommendations about placement.

DeShawn filed exceptions to the report, but withdrew them, on February 26, 2001. That same day, the juvenile court accepted the report and recommendation of the master, and issued an order adjudicating DeShawn a delinquent child and committing him to the custody of the Department, at Bowling Brook.

On May 16, 2001, the Howard County State's Attorney's Office filed in the juvenile proceeding a certification that the crime victim notification request form, as described in Md. Code (1957, 1996 Repl.Vol.), article 27, section 841(9),[3] had been mailed or otherwise delivered to the appellant. On May

---

2. Under the doctrine of reverse waiver of juvenile jurisdiction, the circuit court in a criminal case can waive its original authority over a minor to the juvenile court. *In re Franklin P.*, 366 Md. 306, 332, 783 A.2d 673 (2001). *See also* Md.Code (2001), section 4–202(b) of the Criminal Procedure Article ("CP").

3. At the pertinent time in this case, victim notification request forms were governed by Article 27, section 841(g). That section since has been repealed and recodified as CP 11–914, without substantive change.

25, 2001, the appellant filed the completed crime victim notification request form in the juvenile court.

DeShawn was scheduled for release from Bowling Brook on July 28, 2001. On July 24, 2001, the juvenile court held a disposition review hearing, which was devoted to the question whether the Department's request to move DeShawn to a "step down" juvenile facility should be approved. The appellant was present at the hearing, and his written victim impact statement was read into the record. The statement is as follows:

I was born in El Salvador. My mother died when I was 8 years old, and I lived with my father. There was a civil war in my county [sic] when he was growing up. I never went to school. My family was very poor. We raised corn and beans to eat. I came to this county [sic] with one goal, to work and send money home to my family. I worked for more than two years at Wendy's in Columbia and sent as much as I could to my father. He supports my brother and four sister [sic], including one whose husband was killed. I was happy to do a good job and help my family. I never gave this young man (meaning DeShawn C.) any reason to hurt me. All I did was work and go home at night.

This shooting has left me a prisoner in my own body. I am paralyzed from the chest down. I can't walk, and I am in pain. The bullet is still lodged in my spine. This young man did not manage to kill me but he did kill the person I was. Since I was a boy, I have always been independent, even as a child I hunted and fished to help feed my family. Now I have to depend on my uncle and other relatives for everything [sic] little thing. I hope to work again, but I will still need help with transportation to the job, and there will be many jobs that I can not do. This young man has robbed me of the dreams I had until only God knows when.

Your Honor, my parents never learned to read or write, but they did teach me right from wrong. You don't need a lot of education to know not to steal, not to lie, not to kill. My parents did teach me how to respect other people. Since I was shot, I have learned to write in my own

language. Now I need to learn how to work from my wheelchair.

Finally, Your Honor, I believe the law gives me the right to ask that this young man eventually make restitution to me for the harm he has done. I ask you to order him to pay restitution. Thank you, Your Honor.

A statement by the appellant's uncle also was read into the record.

DeShawn called as witnesses counselors who described the Bowling Brook facility and program, recounted DeShawn's progress, and advocated his being moved to a "step down" program, in which he would live in society but in a supervised setting. The prosecutor responded that the appellant and his family would have preferred the case to have remained in the adult criminal justice system, and a "lengthy incarceration" to have been imposed; but, that not having happened, the appellant at least wished to see "continued consequences."

The court interjected, commenting that the appellant's statement had referred to "some type of restitution," and asking whether that issue had been adjudicated before the master. The prosecutor responded that it had not. The court then inquired whether restitution was "still an open possibility ... at this stage? Is that not available or what?" The prosecutor said it was not, in her view:

Your Honor, I don't know that [restitution is still available]. I don't believe that it is. My understanding is the initial— all the hospital bills and medical bills have been taken care of, that is still an attempt for the Criminal Injury's Compensation Board that requires certain documents that [the appellant] does not have at this particular point in time. It did not cover the continuing medications, and I take full responsibility for that, Your Honor.

The court's focus then returned to the issue of placement. There was no more mention of restitution at that hearing.

On July 26, 2001, the court issued a memorandum opinion and order committing DeShawn to the Department for further

placement as designated by the Department, *i.e.*, allowing the Department to place DeShawn in a "step down" program.

Two days later, the appellant, through private counsel, filed a written request for restitution and for a hearing. He attached documentation of the losses for which he was seeking restitution, including pay stubs from his job at Wendy's. The documentation showed that, on account of the injuries he sustained in the shooting, the appellant lost wages totaling more than $21,000.[4]

On August 1, 2001, DeShawn filed a motion to dismiss the appellant's request for restitution. The State filed an opposition to that motion. The court scheduled a hearing on the restitution request for October 11, 2001. The hearing was postponed indefinitely, however, at the joint request of DeShawn and the State. There was no ruling on the request for restitution and motion to dismiss.[5]

Nearly eight months later, on June 6, 2002, one of DeShawn's counselors sent a memorandum to the prosecuting attorney and others, including the juvenile master, stating, incorrectly, that DeShawn's "Court Order" required him to pay restitution, but no specific amount of restitution had been set. In fact, restitution had not been ordered. The juvenile master wrote a note on the memorandum, on June 9, stating that the case should be set in for "review of restitution."

Thereafter, on a date not revealed in the record, but either on or before June 19, 2002, DeShawn and the State jointly submitted a proposed "Consent Order for Restitution," which

---

**4.** The appellant sought restitution of $10,000, the statutory maximum under Article 27, section 807(n)(2), in effect at the time of this case. Section 807 since has been repealed and recodified, without substantive change, as CP section 11–604.

**5.** A hearing notice and a letter to the court from the State's Attorney's Office documented that a hearing was scheduled and later was postponed. For reasons that are unclear, these documents were not included in the record. The appellant has filed a motion in this Court to include copies of the missing documents in the record; the appellees have not opposed the motion. We are granting the motion, and shall consider the document copies as part of the record in the case.

called for DeShawn to pay the appellant restitution totaling $4,427.50, for medical expenses. The restitution amount did not include any sum for lost wages. The appellant was not given a copy of the proposed Consent Order, or informed about it, prior to its being submitted to the court. The court signed the proposed Consent Order on June 19, 2002, and the order was docketed the next day.

On the evening of June 27, 2002, the prosecutor informed the appellant about the Consent Order. She told the appellant the order provided restitution for medical expenses, but not lost wages. The next day, the appellant, by private counsel, filed a "Motion to Reconsider Order, or Alternatively, to Alter or Amend Judgment" (hereafter, "motion to alter or amend") and a request for a hearing.

In his motion to alter or amend, the appellant complained that the State had violated his rights under Article 27, section 770(e),[6] by not giving him copies of either the proposed or final Consent Order; that he, and not the State, had filed the request for restitution, under Article 27, section 807, and for a hearing, so the State did not have the authority to compromise his request, without his knowledge, consent, or approval; that he had been denied the opportunity for a hearing on his restitution request; and that, if the court properly had considered his restitution request, it would have granted restitution for at least some of the lost wages he suffered as a consequence of the injuries caused by the delinquent acts.

DeShawn and the State each filed oppositions to the appellant's motion to alter or amend. DeShawn argued that the appellant did not have standing, under the Juvenile Causes Act or the Maryland Rules, to challenge a restitution order agreed to by the State and the juvenile offender in a juvenile delinquency case, because he was not a party to the case; that, while certain rights are conferred upon victims in Maryland by statute, none of them extend to cover the situation in

---

**6.** Article 27, section 770, in effect at the time of this case, has since been repealed and recodified, without substantive change, as CP section 11–104.

this case; that there is no authority to file a Rule 2–534 motion to alter or amend in a juvenile case; and that the restitution amounts the appellant was seeking included future losses, which are not recoverable, other than in a separate tort action. In a supplemental memorandum, DeShawn further argued that any increase in the amount of the restitution judgment against him would violate his Fifth Amendment right to be free from double jeopardy.

The State's opposition for the most part tracked the same arguments advanced by DeShawn. The State pointed out that the appellant had received $25,000 from the Criminal Injuries Compensation Fund. The State also asserted that, at the time the Consent Order was entered into, there was no competent evidence of losses incurred by the appellant, other than those pertaining to medical expenses. The State did not explain the basis for that comment.

On April 16, 2003, the court held a hearing on the appellant's motion to alter or amend. The appellant, DeShawn, and the State advanced the same arguments made in their papers. The prosecutor who handled the juvenile case originally and when the Consent Order was submitted had since left the office, but was available to testify. The new prosecutor explained that the appellant was an undocumented alien in this country, and had been working at Wendy's under a false social security number when the shooting happened. It was on that basis that the first prosecutor had concluded that there was not competent evidence that the appellant had sustained recoverable lost wages. The appellant countered that regardless of his immigration status, his pay stubs were competent evidence to prove his lost wages. Most of the hearing was devoted, however, to the issue of standing.

The court took the matter *sub curia,* and on May 1, 2003, issued a memorandum opinion and order, docketed that day, denying the appellant's motion to alter or amend, on the ground that he lacked standing. Specifically, the court concluded that the statutes and rules governing juvenile proceedings did "not allow [it] to entertain a request for relief of the

nature filed here where the State does not join in the request" and that, because "the victim in this case cannot be found to be a party, [he] therefore does not have standing before this court."

The appellant filed a timely notice of appeal. He also filed a timely application for leave to appeal, relying on Article 27, section 776 [7] and Md. Rule 8–204. Neither of the appellees filed a response to the application for leave to appeal. This Court issued an order on July 18, 2003, granting the application, and moving the case to the direct appeal docket.

## DISCUSSION

The appellees have moved to dismiss this appeal, pursuant to Rule 8–602(a)(1), as not being permitted by law. They argue that the appeal is not authorized as a direct appeal, under Md.Code (1974, 2002 Repl.Vol.), section 12–301 of the Courts and Judicial Proceedings Article ("CJ"), which governs generally the right of appeal from a final judgment, and states that "a party may appeal from a final judgment entered in a civil or criminal case by a circuit court." They point out that the appellant, the victim of the delinquent act in this juvenile case, nevertheless is not a "party" to the case. Accordingly, he is not statutorily authorized to prosecute a direct appeal, under CJ section 12–301.

The appellees further argue that the appellant is not permitted by Article 27, section 776 (the statute he relied upon) to file an application for leave to appeal in this Court. Specifically, they assert that section 776 confers upon the victim of a violent crime the right to file an application for leave to appeal from an interlocutory or final order denying or failing to take into consideration certain rights secured to victims by statute, but that the appellant is not a victim of a violent crime, within the meaning of the statute.

---

7. Article 27, section 776 since has been repealed and recodified, without substantive change, as CP section 11–103.

The appellant responds that he has standing to prosecute a direct appeal, under CJ 12–301, because, under the controlling case law, he should be considered a "party" to the delinquency case, within the meaning of that statute. Alternatively, he takes the position that because this Court granted his application for leave to appeal, and did so without opposition, the appellees cannot now argue that he was not entitled to file the application. In his brief and reply brief, he does not address the merits of the argument that he is not a victim of a "violent crime," within the meaning of Article 27, section 776.

### (i)

CJ section 12–301 states, in relevant part:

**Right of appeal from final judgments—Generally.**

Except as provided in § 12–302 of this subtitle, a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law.

Subtitle 8A of the Juvenile Causes Act, CJ sections 3–8A–01, *et seq.*, governing delinquent children, provides that the parties to a juvenile delinquency case include the child who is the subject of the petition, the State as the petitioner, the child's parent, guardian, or custodian, and an adult charged with contributing to the delinquency of a juvenile under CJ section 3–8A–30. CJ section 3–8A–01(q). As noted previously, the appellees take the position that, because the appellant was not a party to the juvenile delinquency case, he did not have the right to appeal from any final judgment entered by the juvenile court, including either the Consent Order or the May 1, 2003 order denying his motion to alter or amend.

The appellant acknowledges that he is not a party to the juvenile case, in the sense of being a named litigant, or under CJ section 3–8A–01(q). He maintains, however, that CJ section 12–301 and its predecessor statutes have been interpreted broadly, to treat as a "party" for purposes of appeal a person

who has an interest in the subject matter of the appeal that will be affected by the appellate decision. He argues that, as the victim of the delinquent act by DeShawn, he is a "party" to the delinquency case in the sense of having an interest in its subject matter, and therefore for purposes of CJ section 12–301.

The appellant is correct that the Court of Appeals has recognized that one not a party to a suit in the circuit court may nevertheless be treated as a party, for purposes of prosecuting an appeal, upon a showing of a direct interest in the subject matter of the suit that will be affected by the decision on appeal. *See Lickle v. Boone*, 187 Md. 579, 584, 51 A.2d 162 (1947) (stating that the statute then in effect permitting an appeal by a party in an equity case "does not restrict the right of appeal to the technical parties to the suit. A person may have such a direct interest in the subject matter of a suit as to entitle him to maintain an appeal, even though he is not one of the actual parties"); *Preston v. Poe*, 116 Md. 1, 6, 81 A. 178 (1911) (observing that, "[w]hile it has been held that [the statute governing appeals] does not restrict the right of appeal to those who are technical parties to the suit, yet it is also well settled that an appellant must be able to show that he has a direct interest in the subject-matter of the litigation"). The principle has been applied sparingly, however.

In *Hall v. Jack*, 32 Md. 253 (1870), the non-party appellant was the assignee of certain promissory notes that the equity court ordered placed in a fund to be distributed to creditors of the assignor. He moved to intervene in the suit, without success. The statute then governing appeals in equity cases permitted an appeal from any final decree or order in the nature of a final decree "passed by a Court of Equity, by any one or more of the persons parties to the suit. . . ." 1864 Md. Laws, Chap. 156. The Court of Appeals held, within the meaning of that statute, that the appellant possessed a sufficient interest in the subject matter of the case to be treated as a party, for purposes of appeal, because the equity court's order had concluded his rights as to the notes. "[B]eing directly interested in the subject matter of the decree, and

having filed his petition in the cause, praying to be permitted to intervene for the protection of his rights, he must be considered as a party within the meaning [of the statute], [and] entitled to [an] appeal." *Hall, supra,* 32 Md. at 263.

■ The holding in *Hall* derives from a fundamental principle of standing to appeal—that an appellate court will not entertain an appeal by one who does not have an interest that will be affected by prosecuting the appeal. *See Curley v. Wolf,* 173 Md. 393, 399, 196 A. 285 (1938) (dismissing appeal by an original party, which lacked any interest in the outcome of the controversy). This principle applies to parties and non-parties alike. The holding in *Hall,* recognizing that in some situations non-parties will be treated as parties for purposes of appeal, has been restated most frequently by the Court of Appeals in cases that, conversely to this case, involve appellants who in fact were parties below, but did not have an interest that could be affected by a decision on appeal, and therefore lacked standing to prosecute an appeal. *See Kreatchman v. Ramsburg,* 224 Md. 209, 222, 167 A.2d 345 (1961) (dismissing an appeal by a taxpayer who had been permitted by the circuit court to intervene as a party in a zoning case but did not have a sufficient interest in the subject matter of the appeal to have standing); *Lickle, supra* 187 Md. at 586, 51 A.2d 162 (holding that a co-respondent in a divorce case who had been permitted by the circuit court to intervene as a party did not have an interest in the case so as to allow him to appeal).

In the same vein, in *First Union Sav. & Loan, Inc. v. Bottom,* 232 Md. 292, 193 A.2d 49 (1963), the Court held that a corporation that was a party to proceedings below, in which a conservator had been appointed to take custody of its property and manage its affairs, nevertheless had a sufficient interest or right in the property to appeal from an order discharging the conservator and appointing a receiver. Likewise, in *Maryland–Nat'l Capital Park and Planning Comm'n v. McCaw,* 246 Md. 662, 229 A.2d 584 (1967), the Court held that the Maryland National Capital Park and Planning Commission

(the "Commission") had a sufficient interest in the outcome of an appeal of a circuit court's approval of a petition for abandonment of a subdivision plat, which included land dedicated by the Commission as a park, to have standing to appeal. The Commission had been permitted to intervene below. The Court of Appeals made plain that, even if the Commission had not been allowed to intervene as a party in the circuit court, its interest in the subject matter of the litigation was sufficient to confer standing to appeal. *Id.* at 672, 229 A.2d 584.

In numerous cases, the Court has recognized the principle stated in *Hall* but has concluded that, in the circumstances before it, the non-party appellant's interest in the subject matter of the appeal was not sufficient to warrant his being treated as a party for that purpose. *See Preston, supra,* 116 Md. at 6, 81 A. 178 (holding that a stockholder in a corporation did not have a sufficient interest in a suit to appoint receivers for the voluntary dissolution of the corporation to permit him to appeal an order dismissing the suit); *In re Buckler Trusts,* 144 Md. 424, 428, 125 A. 177 (1924) (dismissing appeal by a tenant of property for which the appointment of successor trustees under deed of trust was sought and granted, because the tenant was not a party and had no interest in the subject matter of the suit); *Karr, Hammond & Darnall v. Shirk,* 142 Md. 118, 124, 120 A. 248 (1923) (dismissing appeal by an attorney who represented a trustee in a sale of mortgaged premises because attorney was not a party and was not directly interested in the subject matter of the suit); *American Colonization Soc'y v. Latrobe,* 132 Md. 524, 529, 104 A. 120 (1918) (dismissing appeal by the State from a circuit court dismissal of a petition to have property escheated to the State); *Rau v. Robertson,* 58 Md. 506, 508 (1882) (dismissing appeal by former owner of property from decree of sale, holding that appellant did not have any interest in the property). *See also Weinberg v. Fanning,* 208 Md. 567, 570–71, 119 A.2d 383 (1956) (recognizing the principle in *Hall* but holding that the issue on appeal was moot in any event); *Brashears v. Lindenbaum,* 189 Md. 619, 628, 56 A.2d 844 (1948); *Donovan*

*v. Miller,* 137 Md. 555, 557, 112 A. 926 (1921); *Wagner v. Freeny,* 123 Md. 24, 31, 90 A. 774 (1914).

Of pertinence to the case at bar, the Court of Appeals applied the principle in *Hall* in *In re Anderson,* 272 Md. 85, 321 A.2d 516 (1974), a juvenile delinquency case. At the time in question, the Juvenile Causes Act did not include the State or petitioner in its definition of a "party" to a juvenile delinquency case. (It defined "party" to mean "a child named in a petition, or his parent, guardian or custodian." Md.Code (1957, 1973 Repl.Vol.), Article 26, section 70–1(e).) The Court held that the State's *parens patriae* relationship to juveniles gave it such a strong interest in the outcome of decisions in delinquency cases that, under the statute governing appeals in equity cases (which was substantively unchanged from as it existed in *Hall* ), it would be treated as a party, for purposes of the statute's conferring a right of appeal.

In this case, the appellant emphasizes that he was the victim of DeShawn's delinquent act; suffered permanent and extensive personal injuries as a result of the act; personally filed a request for restitution in the juvenile court, without the assistance of the State; and filed the motion to alter or amend, seeking the court's intervention to open the Consent Order, that resulted in the order he is seeking to have reversed on appeal. He maintains that, if this Court were to reverse the juvenile court's ruling that he lacked standing to move to alter or amend the Consent Order, he would be affected, because the court then could consider on its merits his request to modify the Consent Order to include restitution for lost wages. On these bases, the appellant argues that, under *Hall,* his interest in the subject matter of this appeal is sufficient for this Court to treat him as a party to the juvenile delinquency case, under CJ 12–301.

To determine whether the appellant has an interest in the subject matter of the litigation that could be adversely affected by a decision on appeal, for purposes of Rule 12–301, we must consider the nature of the litigation itself.

**598**

■ The case to which the appellant seeks to be considered a party for purposes of CJ section 12–301 is a juvenile delinquency proceeding, under the Juvenile Causes Act. Delinquency cases are special hybrid creatures in the law. The General Assembly enacted the Juvenile Causes Act, granting jurisdiction in juvenile courts over young offenders and establishing the process for treating them, to advance its purpose of rehabilitating the juveniles who have transgressed to ensure that they become useful and productive members of society. *In re Ryan S.*, 369 Md. 26, 49, 797 A.2d 39 (2002); *In re Keith W.*, 310 Md. 99, 106, 527 A.2d 35 (1987); *see also* CJ section 3–8A–02 (stating the purposes of the juvenile delinquency subtitle of the Juvenile Causes Act).

Under the Juvenile Causes Act, juveniles who, in the absence of the juvenile justice system, would be prosecuted in, and punished by, the adult criminal justice system, are instead afforded supervision and treatment, with the aim to achieve rehabilitation. Thus, a juvenile found by the juvenile court to have committed a "delinquent act," that is, an act that, if committed by an adult, would constitute a crime, is adjudicated a delinquent; and in disposition, the court will fashion a plan of supervision, treatment, and rehabilitation appropriate to the juvenile and serving the rehabilitative goals of the Act.

■ The Maryland appellate courts frequently have observed that juvenile delinquency proceedings are "civil in nature." *In re Thomas J.*, 372 Md. 50, 57, 811 A.2d 310 (2002); *In re Anthony R.*, 362 Md. 51, 69, 763 A.2d 136 (2000); *In re John M.*, 129 Md.App. 165, 174, 741 A.2d 503 (1999). The observation often is made by way of contrast, to emphasize that a distinction exists between delinquency proceedings involving juvenile offenders and criminal proceedings involving adults in the criminal justice arena, even though the conduct underlying a delinquent act and a crime may be the same. *See In re Montrail M.*, 87 Md.App. 420, 424–25, 589 A.2d 1318 (1991), *aff'd*, 325 Md. 527, 601 A.2d 1102 (1992) (explaining that a juvenile delinquency case is not a criminal proceeding and does not result in a criminal conviction; and therefore the

juvenile offender is not to be considered or treated as a criminal). As the Court of Appeals has observed:

> "The *raison d'etre* of the Juvenile Causes Act is that a child does not commit a crime when he commits a delinquent act and therefore is not a criminal. He is not to be punished but afforded supervision and treatment to be made aware of what is right and what is wrong so as to be amenable to the criminal laws."

*In re William A.*, 313 Md. 690, 695, 548 A.2d 130 (1988) (quoting *In re Davis*, 17 Md.App. 98, 104, 299 A.2d 856 (1973)). Unlike criminal cases, juvenile proceedings are adjudicated by the court. *See* CJ 3–8A–10 (requiring an adjudicatory hearing to be held before the court after a delinquency petition has been filed).

While juvenile proceedings are characterized as civil in nature, the appellate courts nevertheless recognize that delinquency cases are prosecutions by the State *in lieu* of criminal proceedings, *see In re William A., supra,* 313 Md. at 694, 548 A.2d 130, and that the accused in the juvenile justice system has many of the rights he would be entitled to if he were being prosecuted in the adult criminal justice system. *In re Thomas J., supra,* 372 Md. at 70, 811 A.2d 310 (holding that an accused juvenile has the right to a speedy trial under the due process clause of the 14th Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights); *In re Michael W.*, 367 Md. 181, 185, 786 A.2d 684 (2001) (stating that, "for purposes of the double jeopardy prohibition, a juvenile delinquency proceeding is treated as a criminal prosecution"); *In re Parris W.*, 363 Md. 717, 724 n. 1, 770 A.2d 202 (2001) (commenting that "we are aware of no cases that have interpreted the scope of the right to counsel in juvenile proceedings, including the effective assistance of counsel, any differently because of the origin of the right"); *In re Anthony R., supra,* 362 Md. at 69, 763 A.2d 136 (commenting that a juvenile does not give up all rights that a person is normally entitled to in a criminal proceeding simply because juvenile proceedings are civil in nature).

The juvenile court's authority to enter a judgment of restitution against the delinquent child or his parents, or both, is conferred by the Juvenile Causes Act, CJ section 3–8A–28, but is "as provided under Title 11, Subtitle 6 of the Criminal Procedure Article." That subtitle governs restitution generally, including in criminal cases.[8] Section 11–603(a) sets forth the conditions under which the circuit court in a criminal case or the juvenile court in a delinquency case may enter a judgment of restitution. In either case, restitution may be sought by the State *or* by the victim; and, if restitution is requested and competent evidence of an item of loss covered by the statute is presented, the victim is presumed to have a right of restitution. CP section 11–603(b). A judgment of restitution does not preclude the victim of a criminal or delinquent act from bringing a civil action against the defendant or juvenile offender to recover damages for personal injuries or economic loss covered by the judgment; but a civil judgment will be reduced by the amount of restitution paid. CP section 11–603(c).

 Notwithstanding that juvenile delinquency cases are "civil in nature," they are not civil actions, in the sense of being court proceedings meant to redress private rights. The separate system of courts created by the Juvenile Causes Act to address the problems of juvenile offenders are governed by their own procedures, as set forth in CJ section 3–8A–01, *et seq.*, and Rules 11–101, *et seq.* Delinquency proceedings only can be initiated by the filing of a petition by the State's Attorney. *See* CJ § 3–8A–10(c)(4)(ii). A private person cannot file a delinquency petition, and, if a delinquency petition has not been filed, the juvenile court lacks jurisdiction to make a restitution award. *Hart v. Bull,* 69 Md.App. 229, 233–34, 516 A.2d 1043 (1986). Although the decision to file a delinquency petition can be generated by a complaint by a private person, CJ section 3–8A–10(b)(1), the decision rests with the prosecutor, and must be made based on the best interests of

---

8. As explained, *supra,* at the time of the events in this case, the restitution subtitle was codified in Article 27, section 807 of the Code.

the public or the child. CJ § 3–8A–10(c)(4)(ii). In making the decision, the prosecutor can consider as "one factor *in the public interest*" the need of the victim of the alleged delinquent act for restitution. *Id.* (emphasis added).

**** Because the juvenile justice system exists to rehabilitate and treat youthful offenders who otherwise would be prosecuted criminally for their conduct, juvenile delinquency proceedings primarily serve societal rights and interests, and do not serve to vindicate or advance private rights. That is the case notwithstanding that a victim has the right, under CP section 11–603, to seek restitution, without the State's participation. Whether or not restitution is sought by the victim instead of the State, the purpose of an award of restitution in a juvenile delinquency proceeding (as in a criminal proceeding) is to advance the public interest, not to compensate the victim and make him whole. *In re John M., supra,* 129 Md.App. at 185, 741 A.2d 503. Indeed, CP section 11–603(c) expressly contemplates that the victim will make use of the civil justice system, when necessary, to accomplish compensatory goals.

To be sure, the appellant occupies a tragic central role in this delinquency case. His life was shattered by the shooting. And he made use of the opportunity the restitution statute gave him to seek an award for financial losses he sustained due to DeShawn's misconduct, obtaining a judgment of restitution, albeit not in the sum he contends should have been awarded. Yet, for the reasons we have explained, this delinquency case, brought by the government and prosecuted to redress public wrongs against society by a minor, is not a private civil action, to vindicate the appellant's personal rights.

It was in the latter, purely private context—an equity action affecting an individual's existing right in property that was the subject of a dispute—that the Court in *Hall, supra,* adopted the principle that a non-party can have an interest in the "subject matter" of litigation sufficient to consider him a party for purposes of appeal. Just as the "subject matter" of a criminal case is the vindication of public rights, no matter how devastating the effect of the crime on the victim, the "subject

matter" of a delinquency case is public, not private, no matter how devastating the impact of the delinquent act on the victim. When, in *In re Anderson, supra*, the Court allowed the State to participate as a party on appeal in a delinquency case, even though the Juvenile Causes Act did not expressly so provide, it acknowledged as the basis for its decision the public nature of delinquency proceedings. The State was treated as a party for purposes of appeal in that delinquency case because of the State's interest, grounded in its *parens patriae* relationship to juveniles generally, in the outcome of all delinquency cases.

The appellant's interest in the subject matter of this case is most analogous to a victim's interest in a criminal case; and as the Court of Appeals has held, a victim in a criminal case is not a "party," for purposes of prosecuting an appeal under CJ section 12–301. *Cianos v. State*, 338 Md. 406, 410–11, 659 A.2d 291 (1995). To the extent that the appellant has a private right to compensation for the financial losses caused by DeShawn's delinquent acts, as opposed to having a private property interest such as that implicated in *Hall*, the civil courts are an available forum for him to vindicate that private right.

For the foregoing reasons, the appellant is not a party, and is not considered a party, to the juvenile delinquency case against DeShawn, under CJ section 12–301, and therefore may not prosecute an appeal from a ruling in the case under that statute.[9]

---

9. We note that, under Rule 11–116(a), the juvenile court has revisory power to modify or vacate an order if it "finds that action is in the best interest of the child or the public"; and may proceed to do so "on petition of a party or other person, institution, or agency having supervisory custody of the [child]" or "sua sponte," that is, "on its own motion." As explained, the appellant was not a "party" to the delinquency case, under CJ section 3–8A–01(q); he also, of course, did not have supervisory custody, as stated in the rule. The juvenile court was not authorized, therefore, to entertain his motion to modify or vacate the Consent Order. The juvenile court did and still does have the authority to modify or vacate the Consent Order on its own motion, upon a finding (consistent with the public, not private, nature of juvenile proceedings) that to do so would be in the best interests of DeShawn or the public.

**(ii)**

We next address the appellant's argument that this appeal should not be dismissed because this Court, prior to argument, granted his application for leave to appeal, and did so without opposition by the appellees.

As noted, the appellant based his application for leave to appeal on Article 27, section 776. That statute provided, in pertinent part:

**Appeals by victims of violent crimes.**

(a) *Definition.*—(1) In this section, "victim of a violent crime" means a victim of:

(i) A crime of violence as defined under § 643B of this article; or

(ii) [Except as not applicable to this case], a crime involving, causing, or resulting in death or serious bodily injury. . . .

(c) *Right to file for leave to appeal.*—Although not a party to a criminal proceeding, the victim of the violent crime for which the defendant is charged has the right to file an application for leave to appeal to the Court of Special Appeals from an interlocutory or final order that denies or fails to consider a right secured to that victim by § 773(b) or § 780 of this subtitle or Article 41, § 4–609 of the Code.

(d) *Stay of other proceedings.*—The filing of an application for leave to appeal under this section may not result in the stay of other proceedings in a criminal case without the consent of all the parties.

The appellees argue that the appellant is not a "victim of a violent crime," as defined in section 776, and therefore had no right to apply to this Court for leave to appeal.

Whether the appellant is a "victim of a violent crime," under section 776, is a question of statutory construction. The primary rule of statutory interpretation is to ascertain and effectuate legislative intent. *Dyer v. Otis Warren Real Estate Co.,* 371 Md. 576, 581, 810 A.2d 938 (2002); *In re John M., supra,* 129 Md.App. at 176, 741 A.2d 503. " 'To this end, we begin our inquiry with the words of the statute and, ordinarily,

when the words of the statute are clear and unambiguous, according to their commonly understood meaning, we end our inquiry there also.'" *Dyer, supra,* 371 Md. at 581, 810 A.2d 938 (quoting *Mayor & City Council of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987 (2000)).

> "[I]f the true legislative intent cannot be readily determined from the statutory language alone," we may look to other indicia of that intent, including the structure of the statute, how it relates to other laws, its legislative history, its general purpose, and the "relative rationality and legal effect of various competing constructions."

*Toler v. Motor Vehicle Administration,* 373 Md. 214, 220, 817 A.2d 229 (2003) (quoting *Witte v. Azarian,* 369 Md. 518, 525–26, 801 A.2d 160 (2002)).

Under section 776(a)(i) and (ii), only victims of certain crimes—either crimes meeting the definition in article 27, section 643B(a) or those that have caused "serious bodily injury"—are victims that have the right to file an application for leave to appeal, under section 776(c). A delinquent act, being one "which *would be a crime* if committed by an adult[,]" CJ 3–8A–01(k) (emphasis added)," is not a crime; and it is for that reason that a juvenile who has been found to have committed a delinquent act has not been found guilty of a crime. *In re Montrail M., supra,* 87 Md.App. at 424–25, 589 A.2d 1318.

The language of section 776 not only requires that the victim be a victim of a crime but also expressly contemplates, by the use of the word "defendant" in subsection (c) and the phrases "criminal proceeding" and "criminal case" in subsections (c) and (d), that the proceeding giving rise to the application for leave to appeal be for or in connection with the prosecution of a crime.

██ Thus, the plain language of section 776 leads us to conclude that it was not the legislature's intention to include a victim of a delinquent act within the definition of a "victim of a violent crime" under section 776. It is noteworthy that, in 1997, legislation was proposed, in Senate Bill 173, to alter the

definition of a "victim of a violent crime" in section 776(a) to include the victim of a crime or delinquent act, as the word "victim" is defined in section 770 (pertaining to victim notification). That bill was defeated, however. It is additionally noteworthy that article 27, section 851, which specifically governs the "[r]ights of [a] victim . . . [of] a delinquent act[,]" does not confer the right to file for leave to appeal.[10]

The language and context of section 776 do not permit an interpretation of "victim of a violent crime" to include a victim of a delinquent act; and subsequent history bears that out. The section only gives a victim of a violent crime the right to file an application for leave to appeal. It does not give that right to the victim of a delinquent act, regardless of how violent the act may have been. We are constrained to read section 776 in this fashion. We cannot change the definition of "victim of a violent crime" to include a victim of a delinquent act; only the legislature can take that step.

In this case, DeShawn initially was charged in the circuit court with attempted murder and other crimes meeting the definition of "crimes of violence" under section 643B(a), and therefore under section 776(a)(i); and it is undisputed that the appellant suffered "serious bodily injury," within the meaning of section 776(a)(ii), as a result of the shooting. Because the circuit court granted a reverse waiver motion, however, the case became a juvenile court matter; and criminal charges no longer were pending against DeShawn at the time relevant to this appeal.[11] Thus, when the application for

---

**10.** That statute now appears at CP section 11–1003.

**11.** We recognize that section 776(c) describes the criminal proceeding in which a victim may file an application for leave to appeal as one in which "the defendant is charged," not one in which he has been convicted; and there was a time that DeShawn was "charged" with crimes. The use of the word "charged" instead of "convicted" is necessary, however, because section 776 allows for leave to appeal interlocutory orders as well as final orders. When an interlocutory ruling is made, the defendant will not have been convicted, but will have been charged. Thus, the fact that DeShawn was once charged with violent crimes does not make the appellant a victim of a violent

leave to appeal was filed, the appellant was the victim of a delinquent act in a juvenile proceeding, not the victim of a violent crime in a criminal proceeding, under section 776. Accordingly, he was not entitled to file an application for leave to appeal under that statute.

We disagree with the appellant that the appellees waived their right to challenge this Court's decision to grant his application for leave to appeal, and to move to dismiss the appeal, because they did not file an opposition to the application. The procedure for applications for leave to appeal is governed by Rule 8–204. Subsection (d) of that rule states that a response to an application for leave to appeal "may be filed" by any other party. Thus, while a response in this case might have been helpful to the Court, it was not required. By not filing a response, the appellees did not waive their right to argue that the legal basis upon which we exercised our discretion to grant the application in fact did not exist.

In addition, the challenge the appellees make to the decision to grant the application raises a jurisdictional issue. The jurisdiction of this Court is a function of statute; if we do not have statutory authorization to hear an appeal, we do not have jurisdiction over that appeal. *RTKL Assocs., Inc. v. Baltimore County,* 147 Md.App. 647, 652–53, 810 A.2d 512 (2002). In some circumstances, also as permitted by statute, such as section 776, this Court has discretion over whether to entertain an appeal. *See, e.g., Grayson v. State,* 354 Md. 1, 16, 728 A.2d 1280 (1999) (discussing this Court's authority to exercise discretion to grant an application for leave to appeal from the denial of post-conviction relief). We only may exercise discretion over an application for leave to appeal, however, when the statutory criteria underpinning the application have been met.

---

crime within the meaning of section 776. That would have been the case had the charges against DeShawn continued in the circuit court, but they did not.

In the case at bar, the appellant was not authorized under section 776 to file an application for leave to appeal in this Court, because he was not the victim of a violent crime. For that reason, this Court did not have discretion to grant his application or, if that was the only basis on which an appeal could proceed, to exercise jurisdiction over the case.

**APPEAL DISMISSED. COSTS TO BE PAID BY THE APPELLANT.**