879 A.2d 695

Oscar Antonio LOPEZ–SANCHEZ

v.

**STATE of Maryland and Deshawn C.**

**No. 43, Sept. Term, 2004.**

Court of Appeals of Maryland.

July 28, 2005.

Neil F. Quinter (McDermott Will & Emery LLP, Washington, DC, Russell P. Butler, Upper Marlboro, on brief), for petitioner/cross-respondent.

Julia Doyle Bernhardt, Asst. Public Defender (Nancy S. Forster, Public Defender, Eve L. Brensike, Asst. Public Defender, on brief), for respondents/cross-petitioners.

Keith S. Franz, Azrael, Gann & Franz, LLP, Towson, amicus curiae.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and LAWRENCE F. RODOWSKY, (Retired, Specially Assigned), JJ.

RAKER, J.

Petitioner, the victim of a delinquent act, sought reconsideration of a Consent Order for Restitution that the Circuit Court for Howard County had approved without affording petitioner notice or opportunity to be heard. The Circuit Court, sitting as the Juvenile Court, denied petitioner's Motion for Reconsideration. The Court of Special Appeals dismissed petitioner's appeal. We shall affirm.

## I.

On February 29, 2000, respondent DeShawn C. shot petitioner, Oscar Antonio Lopez–Sanchez, in the back as petitioner was on his way home from work. The bullet fractured petitioner's spine and right rib, with bullet fragments and bone fragments remaining in the spinal canal. As a result of the shooting, petitioner is paralyzed permanently from the chest down.

The State filed a Petition for Delinquency in the Circuit Court for Howard County, sitting as a Juvenile Court, against DeShawn C. Following an adjudicatory hearing on October 27, 2000, a Juvenile Master found DeShawn C. to be involved as to attempted murder, first degree assault, second degree assault, and reckless endangerment. He was adjudicated a

delinquent child and committed to the custody of the Department of Juvenile Justice (currently known as the Department of Juvenile Services).

On May 16, 2001, the State's Attorney's Office for Howard County certified that the crime victim notification request form described in Md.Code (2001, 2004 Cum.Supp.), § 11–104(c) of the Criminal Procedure Article [1] had been mailed or otherwise delivered to petitioner. On May 25, 2001, petitioner filed the completed Crime Victim Notification Request Form.

The Circuit Court held a disposition review hearing on July 24, 2001. The primary subject of this hearing was the future placement of DeShawn C., who was scheduled to complete a program at Bowling Brook Academy on July 28. Petitioner was present at the hearing, and his written victim impact statement was submitted to the court. In the statement, petitioner recounted how he had come to the United States in

---

**1.** At the time of the events in question, § 11–104 was codified at former Art. 27, § 841(9). All statutory reference shall be to the current codification unless otherwise noted.

Section 11–104(c) provides as follows:

"(1) Within 10 days after the filing or the unsealing of an indictment or information in circuit court, whichever is later, the prosecuting attorney shall:

(i) mail or deliver to the victim or victim's representative the pamphlet described in § 11–914(9)(ii) of this title and the notification request form described in § 11–914(10) of this title; and

(ii) certify to the clerk of the court that the prosecuting attorney has complied with this paragraph or is unable to identify the victim or victim's representative.

(2) If the prosecuting attorney files a petition alleging that a child is delinquent for committing an act that could only be tried in the circuit court if committed by an adult, the prosecuting attorney shall:

(i) inform the victim or victim's representative of the right to request restitution under § 11–606 of this title;

(ii) mail or deliver to the victim or victim's representative the notification request form described in § 11–914(10) of this title; and

(iii) certify to the clerk of the juvenile court that the prosecuting attorney has complied with this paragraph or is unable to identify the victim or victim's representative.

(3) For cases described under this subsection, the prosecuting attorney may provide a State's witness in the case with the guidelines for victims, victims' representatives, and witnesses available under §§ 11–1001 through 11–1004 of this title."

order to send money home to his impoverished father and siblings in rural El Salvador, and how he had done so for two years by working at a Wendy's restaurant. He described himself as "a prisoner in my own body," dependant on others for "everything." He stated that "[t]his young man has robbed me of the dreams I had until only God knows when." The statement concluded with the words "[f]inally, Your Honor, I believe the law gives me the right to ask that this young man eventually make restitution to me for the harm he has done. I ask you to order him to pay restitution."

The following colloquy took place with respect to restitution: "THE COURT: Well, one of the things that he said in his statement was about some type of restitution, was that adjudicated in front of the Master?

[PROSECUTOR:] No, Your Honor, it was not.

THE COURT: Is that still an open possibility, or is that—I mean, is that at this stage? Is that not available or what? I'm asking out of ignorance here.

[PROSECUTOR:] Your Honor, I don't know that it is. I don't believe that it is. My understanding is the initial—all the hospital bills and medical bills have been taken care of, that is still an attempt for Criminal Injury's Compensation Board that requires certain document[s] that Mr. Lopez does not have at this particular point in time. It did not cover the continuing medications, and I take full responsibility for that, Your Honor."

On July 26, 2001, the Circuit Court entered an order committing DeShawn C. to the custody of the Department of Juvenile Justice until the age of 21, with the specifics of DeShawn C's placement to be at the Department's discretion. The order did not address restitution.

On July 28, 2001, petitioner submitted a written request for restitution pursuant to § 11–603 of the Criminal Procedure Article,[2] together with a request for a restitution hearing.

---

2. That section provides, in pertinent part, as follows:

Included in this request was documentation of petitioner's economic losses, including pay stubs demonstrating lost wages exceeding $21,000. DeShawn C. filed a motion to dismiss the request, which the State opposed. The Court scheduled a restitution hearing, but postponed the hearing at the joint request of the DeShawn C. and the State, who were then attempting to negotiate an agreed-upon amount of restitution.

In June, 2002, DeShawn C. and the State submitted a proposed "Consent Order for Restitution." DeShawn C. was to pay petitioner $4,427.50 as restitution, reflecting only medical expenses, and not including petitioner's lost wages. The proposed order was not sent to petitioner, nor was petitioner notified that it had been submitted to the court. Without a hearing, the Court signed and filed the Consent Order for Restitution on June 20, 2002.

Petitioner was contacted on June 27, 2002 by an assistant state's attorney, who informed him that the Consent Order had been filed. Petitioner filed a Motion to Reconsider Order or, Alternatively, to Alter or Amend Judgment, asserting that he had been denied his right to receive notice of court

"(a) *Conditions for judgment of restitution.*—A court may enter a judgment of restitution that orders a defendant or child respondent to make restitution in addition to any other penalty for the commission of a crime or delinquent act, if:

\* \* \*

(2) as a direct result of the crime or delinquent act, the victim suffered:
(i) actual medical, dental, hospital, counseling, funeral, or burial expenses;

\* \* \*

(iii) loss of earnings;

\* \* \*

(5) the Criminal Injuries Compensation Board paid benefits to a victim;

\* \* \*

(b) Right of victims to restitution.—A victim is presumed to have a right to restitution under subsection (a) of this section if:
(1) the victim or the State requests restitution; and
(2) the court is presented with competent evidence of any item listed in subsection (a) of this section."

proceedings under § 11–104(e) of the Criminal Procedure Article[3], and his presumptive right to restitution under § 11–603(b) of the Criminal Procedure Article. He filed a Motion for Access to Court Records, asserting that he had good cause to access the records of the juvenile proceeding, as required under § 3–8A–27(b)(1) of the Courts and Judicial Proceedings Article.[4] He requested that the restitution be increased from $4,427.50 to $10,000, the statutory limit in delinquency proceedings under § 11–604(b) of the Criminal Procedure Article. Both DeShawn C. and the State opposed the reconsideration motion on the grounds that petitioner was not a party to the delinquency proceeding and did not have standing to seek reconsideration of the order of restitution.

The Circuit Court held a hearing on April 16, 2003, and on May 1, 2003, denied the motion on the ground that "the victim in this case cannot be found to be a party, and therefore does

---

**3.** Section 11–104(e) provides, in pertinent part, as follows:

"(1) The prosecuting attorney shall send a victim or victim's representative prior notice of each court proceeding in the case, of the terms of any plea agreement, and of the right of the victim or victim's representative to submit a victim impact statement to the court under § 11–402 of this title if:

(i) prior notice is practicable; and

(ii) the victim or victim's representative has filed a notification request form under subsection (d) of this section.

＊　　＊　　＊

(3) As soon after a proceeding as practicable, the prosecuting attorney shall tell the victim or victim's representative of the terms of any plea agreement, judicial action, and proceeding that affects the interests of the victim or victim's representative, including a bail hearing, change in the defendant's pretrial release order, dismissal, nolle prosequi, stetting of charges, trial, disposition, and postsentencing court proceeding if:

(i) the victim or victim's representative has filed a notification request form under subsection (d) of this section and prior notice to the victim or victim's representative is not practicable; or

(ii) the victim or victim's representative is not present at the proceeding."

**4.** Section 3–8A–27(b)(1) provides: "A court record pertaining to a child is confidential and its contents may not be divulged, by subpoena or otherwise, except by order of the court upon good cause shown or as provided in § 7–303 of the Education Article."

not have standing before this court." The court stated as follows:

"The victim here does have a compelling case that he has not been compensated in any way that is commensurate with the severe injuries he has suffered and will suffer for the rest of his life. He remains confined to a wheelchair as a result of Respondent's actions and he likely will not soon be able to be fully employed because of language barriers and his low educational attainment as well as his disability. Mr. Lopez–Sanchez's situation is one that would merit attention if the Court had the power to address it. However, it appears that the current statutes and rules do not allow the Court to entertain a request for relief of the nature filed here where the State does not join in the request."

On June 2, 2003, petitioner filed both an Application for Leave to Appeal and a Notice of Appeal. The State and DeShawn C. filed motions to dismiss petitioner's appeal. The Court of Special Appeals granted the Application for Leave to Appeal. In a reported opinion, the intermediate court dismissed the appeal. *Lopez–Sanchez v. State,* 155 Md.App. 580, 843 A.2d 915 (2004). The court held that petitioner had no right to bring a direct appeal under Md.Code (1973, 2002 Repl. Vol, 2004 Cum.Supp.), § 12–301 of the Courts and Judicial Proceedings Article, because petitioner was not a party to the delinquency proceeding, and did not have a sufficiently direct interest in the outcome to fall within the narrow range of case law permitting technical non-parties to bring appeals. The court further held that petitioner had no right to file an Application for Leave to Appeal under § 11–103 of the Criminal Procedure Article, because he was not a "victim of a violent crime" within the meaning of the statute, and that the court was without power to grant leave to appeal.

We granted Oscar Antonio Lopez–Sanchez's petition for writ of certiorari to consider the following questions:

1. Can the victim of an act of juvenile delinquency appeal the denial of statutory rights granted to the victim in juvenile proceedings by the General Assembly?

2. Does a victim have standing to assert his statutorily-granted rights in the trial court?

3. Whether the petitioner has been denied due process of law under the United States and Maryland Constitutions?

*Lopez–Sanchez v. State,* 381 Md. 677, 851 A.2d 596 (2004).[5]

## II.

Before this Court, petitioner argues that he enjoys a right of direct appeal under Md.Code (1973, 2002 Repl.Vol., 2004 Cum.Supp.), § 12–301 of the Courts and Judicial Proceedings Article.[6] He argues that, as the victim of a delinquent act, he

---

**5.** We also granted DeShawn C.'s conditional cross-petition for certiorari to consider the following questions:

1. In light of the provisions of [Md.Code (2001, 2004 Cum. Supp.), § 11–811 of the Criminal Procedure Article], requiring the reduction of any award by the Criminal Injuries Compensation Board in the amount of any payments received or to be received from the offender, and the award by the board of $25,000 to petitioner, any increase in an award to petitioner will require a set-off from his award by the Board. As petitioner's total monetary award cannot, therefore, increase if he succeeds in this Court, he has no financial stake in the litigation. Under these circumstances, does he lack standing to prosecute this appeal, does this case fail to present a cognizable appellate issue, or is it moot?

2. Assuming a non-party victim of a delinquent act has the right to prosecute an appeal from an order entered in a juvenile delinquency case, is this appeal cognizable or does petitioner lack standing where the appeal does not involve the denial of any of the rights secured by [Md.Code (2001, 2004 Cum.Supp.), §§ 11–302(c), 11–402, 11–403, or 11–404 of the Criminal Procedure Article] or § 6–112 of the Correctional Services Article?

3. Would an increase in the amount of restitution ordered as part of respondent DeShawn C.'s disposition in juvenile delinquency proceedings violate the provision against double jeopardy?

Because we conclude that petitioner has no right to appeal, we reach only the first question presented in the petition for certiorari, and none of the questions presented in the cross-petition.

**6.** The Court of Special Appeals held that petitioner was neither a "party" entitled to appeal under Md.Code (1973, 2002 Repl. Vol, 2004 Cum.Supp.), § 12–301 of the Courts and Judicial Proceedings Article, nor a "victim of a violent crime" entitled to seek leave to appeal under Md.Code (2001, 2004 Cum.Supp.), § 11–103 of the Criminal Procedure Article. Petitioner has abandoned his contention that he has the right to seek leave to appeal under § 11–103 of the Criminal Procedure

has a uniquely strong interest in the determination of restitution in this matter, in notice of proceedings, and in his opportunity to be heard. He points to Article 47 of the Declaration of Rights [7] and to numerous Maryland statutes addressing victims' rights as indicia of the strength of the interest that Maryland has recognized in victims of crimes and delinquent acts. He relies heavily on Md.Code (1973, 2002 Repl.Vol., 2004 Cum.Supp.), § 3–8A–02 of the Courts and Judicial Proceedings Article, which provides, in pertinent part:

"The purposes of this subtitle [Juvenile Causes—Children Other Than CINAs and Adults] are:

(1) To ensure that the Juvenile Justice System balances the following objectives for children who have committed delinquent acts:

(i) Public safety and the protection of the community;

(ii) *Accountability of the child to the victim and the community for offenses committed;* and

(iii) Competency and character development to assist children in becoming responsible and productive members of society."

---

Article. *See* Petition for Certiorari No. 97, 2004 Term, at 6 n. 4 (stating "At this time, Antonio only pursues the relief sought under his notice of appeal and not the relief sought under his application for leave to appeal.")

7. Article 47 of the Declaration of Rights, ratified November 8, 1994, provides as follows:

"(a) A victim of crime shall be treated by agents of the State with dignity, respect, and sensitivity during all phases of the criminal justice process.

(b) In a case originating by indictment or information filed in a circuit court, a victim of crime shall have the right to be informed of the rights established in this Article and, upon request and if practicable, to be notified of, to attend, and to be heard at a criminal justice proceeding, as these rights are implemented and the terms "crime", "criminal justice proceeding", and "victim" are specified by law.

(c) Nothing in this Article permits any civil cause of action for monetary damages for violation of any of its provisions or authorizes a victim of crime to take any action to stay a criminal justice proceeding."

The State argues that the right to appeal in Maryland is a creature of statute entirely. The State contends that § 12–301 of the Courts and Judicial Proceedings Article, providing for the general right to appeal from final judgments, applies only to parties, and that petitioner is not a party to the delinquency proceeding.

## III.

The right to appeal in Maryland is wholly statutory. *See Pack Shack v. Howard County,* 371 Md. 243, 247, 808 A.2d 795, 797 (2002). Parties to civil and criminal actions enjoy a right to appeal from final judgments under Md.Code (1973, 2002 Repl.Vol., 2004 Cum.Supp.), § 12–301 of the Courts and Judicial Proceedings Article. That statute provides as follows:

"Except as provided in § 12–302 of this subtitle [enumerating various exceptions not relevant here], a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law. In a criminal case, the defendant may appeal even though imposition or execution of sentence has been suspended. In a civil case, a plaintiff who has accepted a remittitur may cross-appeal from the final judgment."

Section 12–303 of the Courts and Judicial Proceedings Article also provides parties to civil actions the right to appeal from certain interlocutory orders not at issue in this case. A salient feature of both statutes is that the grant of appellate rights extends only to parties.

A victim is not a party to a criminal prosecution. *See Cianos v. State,* 338 Md. 406, 410–11, 659 A.2d 291, 293 (1995). The non-party status of crime victims has been a central precept of Maryland criminal jurisprudence ever since public prosecution became the sole method of enforcing this State's criminal law.

Delinquency proceedings—while civil in nature—are too similar to criminal prosecutions to warrant different treatment vis-à-vis victim status. Under § 3–8A–03(a) of the Courts and Judicial Proceedings Article, a juvenile court has exclusive original jurisdiction over a child alleged to be delinquent. The jurisdiction of the juvenile court is initiated by a representative of the State filing a petition alleging delinquency. *See* § 3–8A–13 of the Courts and Judicial Proceedings Article.

A delinquent act is defined by § 3–8A–01(k) of the Courts and Judicial Proceedings Article as "an act which would be a crime if committed by an adult." A child may not be adjudicated delinquent unless the State proves each element of the offense beyond a reasonable doubt. Juveniles enjoy due process protections and many rights enjoyed by adult criminal defendants. In fact, so many rights enjoyed by criminal defendants have been held to apply in juvenile proceedings that many of the procedural distinctions between the two types of proceedings, (with the notable exception of jury trials and indictment proceedings), have all but disappeared. *See In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) (proof beyond reasonable doubt standard in adjudicatory phase); *In re Gault,* 387 U.S. 1, 27–59, 87 S.Ct. 1428, 1444–60, 18 L.Ed.2d 527 (1967) (rights to due process, notice of charges, assistance of counsel, confrontation, transcript of proceedings, appellate review, and privilege against self-incrimination); *In re Thomas J.,* 372 Md. 50, 57–58, 811 A.2d 310, 314–15 (2002) (right to speedy trial); *In re Michael W.,* 367 Md. 181, 185, 786 A.2d 684, 687 (2001) (prohibition against double jeopardy); *In re Parris W.,* 363 Md. 717, 724, 770 A.2d 202, 206 (2001) (right to effective assistance of counsel); *In re Anthony R.,* 362 Md. 51, 76, 763 A.2d 136, 150 (2000) (statute of limitations equivalent to that for criminal misdemeanor offenses); *In re Montrail M.,* 325 Md. 527, 532–538, 601 A.2d 1102, 1103–07 (1992) (doctrine of merger); *In re William A.,* 313 Md. 690, 698, 548 A.2d 130, 133–134 (1988) (infancy defense).

A criminal act is an offense against the sovereign, a wrong injurious not only to the victim but to the public at large, and, as such, is brought in the name of the State of Maryland. A delinquency proceeding is also brought in the name of the State of Maryland. The right, and duty, to proceed with a delinquency action and to accept a plea or disposition in a delinquency proceeding lies solely with the State's Attorney, not the victim, and the prosecutor's decision may not be "vetoed" or appealed by the victim. A juvenile proceeding furthers the interests of the State and the public as a whole, although the prosecutor may, and as a matter of policy should, confer with and consider the wishes of the victim. But that is not to say that the victim is a *party* to the case, or that a dissatisfied victim has the right to appeal.

The Court of Special Appeals explained the limitations as follows:

> "Delinquency proceedings only can be initiated by the filing of a petition by the State's Attorney. A private person cannot file a delinquency petition, and, if a delinquency petition has not been filed, the juvenile court lacks jurisdiction to make a restitution award. Although the decision to file a delinquency petition can be generated by a complaint by a private person, the decision rests with the prosecutor, and must be made based on the best interests of the public or the child. In making the decision, the prosecutor can consider as 'one factor *in the public interest*' the need of the victim of the alleged delinquent act.' "

*Lopez–Sanchez,* 155 Md.App. at 600–01, 843 A.2d at 927 (citations omitted). The State, in a delinquency proceeding, just as the State, in a criminal proceeding, is the party in the proceeding, represented by the State's Attorney. The victim is not a party to the proceeding and acts only as a witness, although vested with statutory and constitutional rights to restitution. Because the victim is not a "party," he or she does not enjoy the general right of appeal found at § 12–301 of the Courts and Judicial Proceedings Article.

Petitioner relies on cases where this Court has recognized a non-party's right to bring a limited appeal from decisions affecting the party's direct and substantial interests. In particular, most of these appeals were direct appeals from trial court orders denying media organizations access to proceedings. *See Baltimore Sun v. Mayor & City Council of Baltimore*, 359 Md. 653, 665, 755 A.2d 1130, 1137 (2000); *Baltimore Sun Co. v. State*, 340 Md. 437, 447, 667 A.2d 166, 171 (1995); *Baltimore Sun v. Colbert*, 323 Md. 290, 297–98, 593 A.2d 224, 227 (1991); *Buzbee v. Journal Newspapers*, 297 Md. 68, 76, 465 A.2d 426, 431 (1983); *News American v. State*, 294 Md. 30, 40–41, 447 A.2d 1264, 1269–70 (1982). *See also Matter of Anderson*, 272 Md. 85, 91–92, 321 A.2d 516, 519–20 (1974) (State permitted to appeal juvenile proceeding before enactment of statute making State party to juvenile causes), *appeal dismissed, Epps v. Maryland*, 419 U.S. 809, 95 S.Ct. 21, 42 L.Ed.2d 35 (1974), *cert. denied, Anderson v. Maryland*, 421 U.S. 1000, 95 S.Ct. 2399, 44 L.Ed.2d 667 (1975); *Karr v. Shirk*, 142 Md. 118, 121, 120 A. 248, 249 (1923) (recognizing that non-parties with direct interest may be entitled to appeal but finding appellant law firm to hold no such interest); *Preston v. Poe*, 116 Md. 1, 6, 81 A. 178, 179 (1911) (recognizing same but finding appellant stockholder to hold no such interest); *Hall v. Jack*, 32 Md. 253, 263 (1870) (assignee of notes permitted to appeal but denied relief on merits).

Petitioner has not identified any case in which we have afforded a right to appeal in the light of a clearly contrary legislative intent. The General Assembly has addressed the appellate rights of crime victims, and in so doing has considered and rejected legislation that would have granted appellate rights to victims in delinquency proceedings. Md.Code (2001, 2004 Cum.Supp.), § 11–103 of the Criminal Procedure Article provides, in pertinent part, as follows:

"(a) *'Violent crime' defined.*—

(1) In this section, 'violent crime' means:

(i) a crime of violence; or

(ii) except as provided in paragraph (2) of this subsection [governing certain transportation and natural resources offenses], a crime involving, causing, or resulting in death or serious bodily injury.

\*　　\*　　\*

(b) *Right to file for leave to appeal.*—Although not a party to a criminal proceeding, a victim of a violent crime for which the defendant is charged may file an application for leave to appeal to the Court of Special Appeals from an interlocutory or final order that denies or fails to consider a right secured to the victim by § 11–302(c), § 11–402, § 11–403, or § 11–404 of this title or § 6–112 of the Correctional Services Article.[8]

(c) *Stay of other proceedings.*—The filing of an application for leave to appeal under this section does not stay other proceedings in a criminal case unless all parties consent."

The Court of Special Appeals held that this statute does not apply to victims of delinquent acts, stating as follows:

"A delinquent act, being one 'which *would be a crime* if committed by an adult[,]' CJ 3–8A–01(k) (emphasis added), is not a crime; and it is for that reason that a juvenile who has been found to have committed a delinquent act has not been found guilty of a crime.

The language of section [11–103] not only requires that the victim be a victim of a crime but also expressly contemplates, by the use of the word 'defendant' ... and the phrases 'criminal proceeding' and 'criminal case' ..., that

---

8. Section 11–302(c) of the Criminal Procedure Article governs the right of victims to be present at trial. Section 11–402 governs the right of victims to submit victim impact statements for use in presentence investigations. Section 11–403 governs the right of victims and victims' representatives to address the court during sentencing and disposition hearings. Section 11–404 governs the right of victims' representatives to address the jury during the sentencing phase in death penalty trials. Md.Code (1999, 2004 Cum.Supp.), § 6–112 of the Correctional Services Article mandates that the Division of Parole and Probation include a victim impact statement, if submitted, in presentence investigation reports.

the proceeding giving rise to the application for leave to appeal be for or in connection with the prosecution of a crime."

Petitioner does not now challenge this holding, that § 11–103 grants limited appellate rights to the victims of certain crimes, but no appellate rights to the victims of delinquent acts.

As the intermediate appellate court noted, prior to enacting the Victims' Rights Act of 1997, 1997 Md. Laws Ch. 312, the Legislature had considered and rejected an amendment to § 11–103 (then codified as Art. 27, § 776) that would have replaced the current definition of "victim" with, *inter alia,* "a victim of . . . a crime as defined under § 770 of this article." *See* Senate Bill 173 (1997). At that time, Art. 27, § 770(a)(2) defined "victim" as "an individual who suffers direct or threatened physical, emotional, or financial harm as a direct result of a crime *or delinquent act. . . .*" (Emphasis added.) Thus, not only is § 11–103 silent as to a right of appeal for victims of delinquent acts, but the plain language of the statute reflects a rejection of language that would have created this right. Although the cases cited by petitioner indicate a narrow judicial enlargement of the general right to appeal under § 12–301 of the Courts and Judicial Proceedings Article, it would be illogical to extend this enlargement to victims of delinquent acts. The Legislature has enacted a statute, § 11–103 of the Criminal Procedure Article, addressing the appellate rights of victims. The rights granted by that statute do not extend to the victims of delinquent acts. When later amending § 11–103, the Legislature considered and rejected granting appellate rights to these litigants.

## IV.

Victims' rights have received considerable attention in recent years, and rightfully so. On both the federal and state levels, legislatures have expressed the strong public policy that victims should have more rights and should be informed of the proceedings, that they should be treated fairly, and in certain cases, that they should be heard. These rights, pro-

vided by the Maryland Legislature and the Maryland Constitution, are to be followed and respected. If, however, the prosecutor or the trial court does not follow the law with respect to a victim's rights in a juvenile proceeding, the Legislature has not given to the victim the general right to appeal that decision.

In the instant case, the victim is not a party to the delinquency proceeding and therefore cannot appeal. The General Assembly considered and rejected legislation that would have conferred such a right on the victims of delinquent acts. Any right of the victim to appeal, or to file an application for leave to appeal, must originate from the General Assembly, not from this Court.[9]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

WILNER and HARRELL, JJ. concur.

Concurring Opinion by WILNER, J., joined by HARRELL, J.

With great reluctance, I concur in the judgment. After years of effort on the part of victims' rights organizations and general direction in a 1994 Constitutional Amendment (Md. Decl. of Rts. Art. 47), the Legislature, through the enactment of the Victims' Rights Act of 1997, confirmed and expanded the right of victims, in both criminal and delinquency proceedings, to be present in court, to address the court at an appropriate time, to request restitution, and, if the facts warrant, to have the court order restitution. The statutes in that regard are clear and not really in dispute.

The Court concludes, however, and correctly so, that, notwithstanding that supposed beneficence to victims, the Legislature has not afforded victims the right to appeal if those

---

9. Petitioner is not without a legal remedy for the injuries he has suffered. He has been greatly wronged and has suffered enormously because of DeShawn C.'s delinquent act. The conduct that caused appellant's injuries is a tort as well as a delinquent act, and DeShawn C. may be liable in a civil action.

basic rights are denied. Presumably as a matter of rationally considered public policy, the General Assembly has therefore made those hard-won rights largely illusory. Although disciplinary proceedings conceivably may be brought against a judge who wilfully violates clear statutory rights, there seems to be no efficient remedy for a victim, like Mr. Lopez–Sanchez, if a judge, whether in good or bad faith, denies the victim the rights the Legislature has conferred.[1]

It is important to keep in mind what the real issue is in this case. Mr. Lopez–Sanchez is not asking this Court to grant him additional restitution. His complaint is that he was deliberately and wrongfully excluded from the trial court's consideration of what was denominated as a consent order that was intended predominantly for his benefit but to which his consent was never sought and never given—that he was not consulted before the order was presented to the court, that the court acted wrongfully in signing it without a hearing and without notice to him, and that he was denied his right to address the court with respect to the matter—and he is absolutely correct. He was not only not afforded those rights; he was denied them. The Circuit Court, in my view, was in clear error in signing the consent order *ex parte*, without notice to the victim, who had properly requested such notice,

---

1. Judges are not, and should not be, ordinarily subjected to disciplinary proceedings merely for misconstruing or not following the law. Except in extraordinary cases, correction of error is left to the appellate process. When that process is unavailable, however, judges have a special duty to be careful to assure that rights specifically conferred on people either by Constitutional mandate or, as here, by statute are not knowingly denied or violated. Canon 3 A. (1) of the Maryland Code of Judicial Conduct (Maryland Rule 16–813) requires a judge to "be faithful to the law." Canon 3 A. (5) requires a judge to "accord to every person who is legally interested in a proceeding, or the person's lawyer, full right to be heard according to law."

The Court, in a footnote, observes that a victim is free to sue his/her assailant for civil damages. As we pointed out in *Grey v. Allstate*, 363 Md. 445, 458–59, 769 A.2d 891, 899 (2001), however, one of the principal reasons for allowing criminal (and Juvenile) courts to order restitution was that "once the State exacted its retribution, through either fine or imprisonment, there was little or nothing left for a victim to collect from the offender in a civil proceeding."

and then in denying his motion for reconsideration on the ground that he did not have standing to make the motion.

The gross injustice to Mr. Lopez–Sanchez, and the legal errors that produced that injustice, become clear when one considers what actually occurred in the Circuit Court and the kinds of arguments offered by the State and the perpetrator of the atrocious attack on him, both in the Circuit Court and on appeal.

On February 29, 2000, petitioner was shot in the back while on his way home from work and, as a result, was severely injured. The lower part of his body remains permanently paralyzed. In August, 2000, the 17–year-old respondent, DeShawn C., was arrested and initially charged in the criminal division of the Circuit Court with a range of crimes, headed by attempted murder.

At some point, the criminal court, pursuant to Maryland Code, § 4–202 of the Criminal Procedure Article (CP) and over the State's objection, waived its jurisdiction over the criminal action and transferred the case to the division of the court sitting as a Juvenile Court, and a petition was filed in that court alleging that DeShawn was a delinquent child. On February 26, 2001, the court adjudicated DeShawn to be a delinquent child and ordered his placement at Bowling Brook Academy, subject to further order of the court as to disposition. The adjudication was based on a finding that DeShawn had committed acts which, if committed by an adult, would constitute attempted murder, first degree assault, second degree assault, and reckless endangerment.

On July 24, 2001, just prior to his scheduled release from Bowling Brook, the court conducted a hearing to determine what further to do with DeShawn, who apparently had made significant progress at Bowling Brook. In conformance with what is now CP § 11–104(c), the prosecutor had notified petitioner of his right to request restitution pursuant to CP § 11–606, and, in response, petitioner had filed a proper notification request form stating that he wished to receive notice about "all events related to my case and the defendant/juvenile, as required by law, so that I have the opportuni-

ty to exercise the rights that I am entitled to as a crime victim." [2]

The court was advised at the hearing that, pursuant to a claim petitioner had filed with the Criminal Injuries Compensation Board, all of his hospital and medical bills had been paid, and that, once proper documentation was assembled, compensation would be provided for continuing medications. Although petitioner submitted a poignant written victim impact statement in support of a request for restitution, nothing was done with respect to restitution at that time.[3] At the conclusion of the hearing, the court committed DeShawn to the Department of Juvenile Services (DJS) until he reached the age of 21, for placement designated by that Department.[4]

---

2. At the time of these events, the relevant statutes were codified in Article 27 of the Code. All of those statutes, in the meanwhile, have been recodified as part of the Criminal Procedure Article, 2001 Md. Laws, ch. 10, which took effect October 1, 2001. For convenience, I shall use the current statutory references.

3. In relevant part, petitioner informed the court: "I was born in El Salvador. My mother died when I was 8 years old, and I lived with my father. There was civil war in my country when I was growing up. I never went to school. My family was very poor. We raised corn and beans to eat. I came to this country with one goal: to work and send money home to my family. I worked for more than two years at Wendy's in Columbia and sent as much as I could to my father. He supports my brother and four sisters.... All I did was work and go home at night. This shooting has made me a prisoner in my own body. I am paralyzed from the chest down. I can't walk, and I am in pain.... I had always been independent. Even as a child, I hunted and fished to help feed my family. Now I have to depend on my uncle and other relatives for every little thing. I hope to work again, but I will need help with transportation to the job, and there will be many jobs that I cannot do.... Your Honor, my parents never learned to read and write, but they did teach me the difference between right and wrong.... My parents did teach me how to respect other people. Since I was shot, I have learned to write in my own language. Now I need to learn to work from a wheelchair. Finally, Your Honor, I believe the law gives me the right to ask that this young man eventually make restitution to me for the harm he has done. I ask you to order him to pay restitution."

4. The Department's name has changed a number of times. It was then known as the Department of Juvenile Justice but I shall use the abbreviation of its present name (DJS).

On August 1, 2001, petitioner filed a formal request for restitution, attaching the statement he submitted at the July 24 hearing, copies of his pay stubs showing a wage loss of $21,000 as of then, and various pharmacy bills. He stated in the request that any bills not attached to the form would be "presented to the Court at the Restitution hearing in this matter." In a motion to dismiss that request, DeShawn averred that it was untimely and that *the State* had waived petitioner's right to restitution. The prosecutor responded that the request *was* timely, that the State had *not* waived petitioner's right to restitution, and that petitioner was seeking restitution not only from DeShawn but from his father as well. *See* Maryland Code, Cts. & Jud. Proc. Article (CJP) § 3–8A–28 and CP § 11–604(a).

By agreement between DeShawn and the State, nothing of significance then occurred for nearly eleven months. On June 20, 2002, without any notice to petitioner and apparently without a hearing, the court entered a Consent Order of Restitution agreed to by the State's Attorney and DeShawn, in which DeShawn was ordered to pay restitution to petitioner, through DJS, in the amount of $4,427, subject to further order of the court. That amount did not cover any wage loss sustained by petitioner as a result of the shooting and was considerably less than the $10,000 maximum allowed by CP § 11–604(b). Petitioner was told about the Consent Order by the prosecutor on June 27, 2002.

On July 1, 2002, the hitherto unrepresented and non-English-speaking petitioner, having obtained counsel through the Maryland Crime Victim's Resource Center, filed a motion for access to the Juvenile Court records and a motion to reconsider and to alter or amend the restitution order. He confirmed that he had received no notice of the Consent Order prior to its presentation to and adoption by the court, that he had not received a copy of it, and that, because Juvenile Court records are confidential, he could not even get a copy from the court. In the motion for reconsideration or to alter or amend, he complained that the right to restitution was *his,* not the State's, and that he had never consented to the Order. Based

on pay stubs documenting his pre-shooting earnings, petitioner averred that he had suffered by then more than $30,000 in wage losses as a result of the shooting and may have sustained medical expenses not included in the Consent Order.

DeShawn objected to both motions, claiming that petitioner was not entitled to access the court's records, that he had no standing to request further restitution or even file a motion to alter or amend the judgment, and that any increase in restitution at that point would violate his right against double jeopardy. The State had no objection to giving petitioner access to the records but agreed that petitioner had no standing to upset the Consent Order. It alleged that the amount agreed to was based on documented receipts for prescriptions and the estimated cost of a wheelchair and that, at the time the Order was prepared, there was no evidence of any other loss warranting restitution. The State informed the court that petitioner had received $25,000 from the Criminal Injuries Compensation Commission and that another $20,000 was possibly available for future medical expenses.

Ten months elapsed without any consideration being given to the motion to reconsider the restitution order. In the meanwhile, in March, 2003, at the request of DJS, DeShawn's case was transferred to Ohio, where DeShawn had gone to live with his mother. There was some evidence that DeShawn at that point had paid only $1,900—less than half of the required restitution. Whether that was in keeping with the schedule established by DJS is not clear. In April, the court held a hearing on the motions. In explaining why lost wages were not included in the Consent Order, the prosecutor advised, but presented no evidence to support, that petitioner did not have legal status in the United States and that he had been working under a false social security number. The prosecutor also averred that, due to a subrogation lien held by the Criminal Injuries Compensation Board on account of its award, the Board would be entitled to recover any additional restitution that might be paid or payable to petitioner.

On May 1, 2003, the court entered a Memorandum and Order denying the motion for reconsideration. Though recognizing that petitioner had "a compelling case that he has not been compensated in any way that is commensurate with the severe injuries he has suffered and will suffer for the rest of his life," the court, citing two Court of Special Appeals decisions (*Hart v. Bull,* 69 Md.App. 229, 516 A.2d 1043 (1986) and *In re Zephrin D.,* 69 Md.App. 755, 519 A.2d 806 (1987)), held that, "the current statutes and rules do not allow the Court to entertain a request for relief of the nature here where the State does not join in the request." The court thus concluded that, as petitioner was not legally a party to the juvenile proceeding, he "does not have standing before this court."

Petitioner filed both an appeal and an application for leave to appeal to the Court of Special Appeals. Although the intermediate appellate court initially granted the application for leave to appeal without opposition, it ultimately decided that petitioner was without standing to file or prosecute an appeal. *Lopez–Sanchez v. State,* 155 Md.App. 580, 843 A.2d 915 (2004). The direct appeal was dismissed upon a finding that petitioner was not a party to the juvenile proceeding and had no interest in the appellate proceeding that might give him an extended party status. The application for leave to appeal, the court added, was based on what is now CP § 11–103, allowing the "victim of a violent crime," though not a party to a criminal proceeding, to file such an application from a final or interlocutory order that denies a right secured to the victim by certain enumerated sections of the Criminal Procedure and Correctional Services Articles. Because it concluded that petitioner, though a victim, was not the victim of a "violent crime," as that term was defined in the statute, the court held that he had no right to file an application and that the court therefore had no authority to grant it. The appeal was thus dismissed. As the Court notes, we granted Mr. Lopez–Sanchez's petition for *certiorari* and DeShawn's cross-petition to decide whether the Juvenile Court acted correctly in denying petitioner's motion for reconsideration and whether

the Court of Special Appeals acted correctly in dismissing his direct appeal.

The laws dealing generally with the right of compensation, including restitution, for victims of criminal or delinquent behavior are set forth in CP, Title 11, principally, though not entirely, in subtitle 6, dealing specifically with restitution, and subtitle 8, dealing with the Criminal Injuries Compensation Board. Although both a system of compensation by the State through the Criminal Injuries Compensation Board and provision for restitution by the perpetrator have been in existence in Maryland for many years—State compensation since 1968 and a limited right of restitution dating back at least to 1809— most of the laws dealing with the rights of victims of criminal and delinquent behavior, including the right to seek and receive restitution, were reorganized by the Victims' Rights Act of 1997 (1997 Md. Laws ch. 312), in light of Article 47 of the Maryland Declaration of Rights, adopted in 1994.[5] *See Grey v. Allstate, supra,* 363 Md. at 462, 769 A.2d at 901.

In a chronological sequence, the first rights relevant to restitution are those requiring notice to the victim of his/her rights. CP § 11–914 requires the State Board of Victim Services to develop pamphlets informing victims of their statutory rights and a notification request form that can be used by victims to implement those rights. CP § 11–104(b) requires law enforcement officers, District Court Commissioners, and DJS intake officers to distribute the pamphlets to victims with whom they have contact. Section 11–104(c) requires prosecu-

---

5. Article 47 provides, in relevant part, that (1) a victim of crime shall be treated by State agents with dignity, respect, and sensitivity during all phases of the criminal justice process, (2) in a case originating by indictment or information filed in a Circuit Court, a victim of crime has the right to be informed "of the rights established in this Article," and, on request and if practicable, to be notified of, attend, and be heard "at a criminal justice proceeding," as those rights "are implemented and the terms 'crime,' 'criminal justice proceeding,' and 'victim' are specified by law," but (3) nothing in the Article permits any civil cause of action for monetary damages for a violation of its provisions or authorizes a victim of crime to take any action to stay a criminal justice proceeding. Article 47 itself says nothing about restitution.

tors to distribute the pamphlets and the notification request form in criminal cases, and the notification request form in juvenile delinquency cases. That section specifically requires prosecutors who file a petition alleging that a child is delinquent for committing an act that would have to be tried in the Circuit Court if committed by an adult (1) to inform the victim of the right to request restitution under § 11–606, (2) to mail or deliver to the victim a notification request form provided for in § 11–914(10), and (3) to certify to the clerk of the Juvenile Court that the prosecutor has either complied with those requirements or has been unable to do so. That was apparently done in this case.

If the victim desires to be notified of further proceedings, he/she must fill out the notification form and file it with the prosecutor, who then sends it to the clerk of the Circuit or Juvenile Court. § 11–104(d). If such a form has been filed and prior notice is practicable, the prosecutor must send, or arrange for the clerk to send, prior notice to the victim of "each court proceeding in the case." § 11–104(e)(1),(2). If prior notice is not practicable or a victim who has filed a notification form is not in court, the prosecutor, as soon after a proceeding as practicable, must inform the victim of any plea agreement or judicial action that affects the interests of the victim, including any disposition by the court. § 11–104(e)(3). That notice must include a copy of any commitment or probation order. § 11–104(f). For purposes of these notification provisions, a "victim" is defined as a person "who suffers actual or threatened physical, emotional, or financial harm as a direct result of a crime or delinquent act." § 11–104(a)(2). Petitioner was clearly a victim under that definition.

In addition to these general notification provisions, § 11–614 provides that the prosecutor *should,* if practicable, notify an eligible victim of the victim's right to request restitution and assist the victim to prepare such a request. For purposes of that statute, a "victim" is defined as "a person who suffers personal injury or property damage or loss as a direct result of a crime or delinquent act." § 11–601(j)(1). That, too, was apparently done. The restitution request form filed by peti-

tioner, that expressly requested and clearly anticipated a hearing on restitution, appeared to be on a standard preprinted form.

The second set of rights that bear on, but do not expressly deal with, restitution are the rights to attend court proceedings, to present to the court a victim impact statement, and to address the court with respect to disposition or sentence. Subject to certain exceptions not relevant here, § 11–302(b) and (c) provide that a victim of a crime or delinquent act has the right, after testifying, to be present at the trial of the defendant or at an *adjudicatory* hearing of an alleged delinquent child.

Although § 11–302 refers only to an adjudicatory hearing in Juvenile Court, CJP § 3–8A–13(f), dealing specifically with Juvenile Court hearings, affords a greater right of victim presence. That section provides that, in a case in which a child is alleged to have committed a delinquent act that would be a felony if committed by an adult, "the court shall conduct in open court *any hearing or other proceeding* at which the child has a right to appear," subject to the right of the court, for good cause, to exclude the general public "and admit *only the victim* and those persons having a direct interest in the proceeding." (Emphasis added). Under that statute, in light of the fact that the attempted murder and first degree assault charges included in the delinquency petition would constitute felonies if committed by an adult, petitioner clearly had a right to attend any disposition or other hearing that DeShawn had a right to attend.

The right to make statements to the court, in the present context, is provided for in §§ 11–402 and 11–403. Section 11–402(a) provides, in relevant part, that any predisposition investigation by DJS must include a victim impact statement if the delinquent child caused physical, psychological, or emotional injury to the victim in committing a delinquent act that would be a felony if committed by an adult. Section 11–402(b) adds that, if a predisposition statement is not prepared by DJS, the victim may submit a victim impact statement directly to the

court. The court is required to consider a victim impact statement in determining an appropriate sentence or disposition and in entering a judgment of restitution. § 11–402(d). Section 11–403 requires a court, if practicable, to allow a victim who has filed a notification request form to address the court under oath at a sentencing or disposition hearing before the imposition of sentence or disposition.

The right to, and procedures for obtaining, restitution are set forth in subtitle 6 of title 11. Section 11–603(a), in relevant part, permits a court to enter a judgment of restitution that, in addition to any other penalty, orders a criminal defendant or a delinquent child to make restitution if, among other things, (1) as a direct result of the crime or delinquent act, the victim suffered actual medical, hospital, or dental expenses, any other direct out-of-pocket loss, or "loss of earnings," or (2) the Criminal Injuries Compensation Board paid benefits to a victim. Section 11–603(b) provides that a victim "is presumed to have *a right* to restitution under subsection (a) of this section if ... *the victim or* the State requests restitution; and ... the court is presented with competent evidence of *any item* listed in subsection (a) of this section." (Emphasis added). Section 11–603(c) makes clear that a judgment of restitution does not preclude a victim who has suffered personal injury or loss of earnings from bringing a civil action to recover damages from the restitution obligor but that any civil verdict must be reduced by the amount paid "under the criminal judgment of restitution."

In a juvenile delinquency proceeding, § 11–604 permits the court to order both the child and the child's parent to pay restitution, provided that the parent has been afforded a reasonable opportunity to be heard and present evidence. A restitution judgment under subtitle 6 may not exceed $10,000 in the aggregate. Section 11–605 permits a court to refuse to enter a judgment of restitution, but *only* if the court finds either that the obligor does not have the ability to pay the judgment or that extenuating circumstances exist that make a judgment of restitution inappropriate. If the court refuses to order restitution, however, it must state its reasons on the

record. Most of the remaining sections of subtitle 6 deal with the enforcement and payment of restitution orders and are not relevant here.

Unquestionably, under the construct of these statutes, petitioner had a right to have the Juvenile Court consider his request for restitution. He had a statutory right to present a claim; he had a statutory right to appear in court and support his claim, through both a victim impact statement that the court is required to consider in deciding upon a disposition and through an oral presentation under oath prior to a disposition. Assuming that the claim was supportable by evidence and is within the $10,000 limit, he is presumed to have a right to the restitution, including for loss of earnings. As noted, § 11–605 permits a court to deny restitution only if it finds that the obligor in not able to pay or that "there are extenuating circumstances that make a judgment of restitution inappropriate," and, if either finding is made, the court must state it on the record.

So far as I can tell from this record, five substantive, non-procedural grounds were offered at different points, by either the State or DeShawn, for denying petitioner's request for additional restitution: (1) by agreeing to and entering into the Consent Order, the State had waived petitioner's right to seek additional restitution; (2) petitioner might not be entitled to restitution for wage loss because he "did not have legal status" in the United States and was working under a false social security number; (3) at the time the Consent Order was prepared, he had not documented any wage loss; (4) he either had received or would receive compensation from the Criminal Injuries Compensation Board for his wage losses and that Board would be entitled to recover as a subrogee any additional restitution paid by DeShawn (or his father, whose liability was never apparently considered); and (5) any increase in restitution above the amount set in the Consent Order would violate DeShawn's protection against double jeopardy. I am unable to find any argument by the State or DeShawn or any finding by the court that DeShawn would be unable to pay additional restitution.

The court made no finding that *any* of those asserted grounds constituted an "extenuating circumstance that [would] make [an additional] judgment of restitution inappropriate," and, of the five substantive grounds asserted, only the second, on this record, might possibly constitute such a circumstance:

(1) I can find nothing in the law that allows the State to waive a victim's right to restitution for his/her own injury and loss. So long as the victim files a proper request, the statutory right to seek restitution belongs to the *victim,* not the State. Although, in expressing its view as to what a proper disposition might be for a particular juvenile delinquent, the State is certainly free to present evidence and argument that restitution generally or above a certain amount would be inappropriate under the circumstances, I can find no authority for the State, on its own initiative, to waive a victim's right to seek the restitution. To imply such authority would run counter to the entire thrust of subtitle 6.

(2) I can find nothing in this record actually to document that petitioner was unlawfully in this country—merely an unsupported assertion at one point by the prosecutor. Nor has it been established that unlawful status in the country would serve as a legal barrier to restitution for wage losses. Nonetheless, had such an unlawful status been established, it may be that the court could have found that status to be an "extenuating circumstance" that would make additional restitution inappropriate. It is possible, perhaps even likely, that, if, indeed, petitioner was not a legal resident, his employment would have been terminated for that reason, once that fact came to light. That is quite irrelevant, however, as the court made no such finding and did not deny the restitution on that basis.

(3) The State's assertion that when the Consent Order was prepared there was no documentation of any wage loss is not only unsupported, but is, in fact, contradicted by the record. Petitioner attached to the request he presented to the court on August 1, 2001—ten months before the Consent Order was prepared—pay stubs showing taxable wages earned in 1998 of

$13,821, in 1999 of $15,214, and through the third week in February, 2000 of $2,235. At that fairly consistent rate, his wage loss after the shooting was about $21,000. As noted, he expressly asked for a hearing on that request and advised that any documents not attached to the written request would be presented to the court at that hearing. The State never questioned the accuracy of the pay stubs or disputed that the shooting alone rendered petitioner unable to work.

The Consent Order was not prepared until June, 2002, and petitioner was never afforded an opportunity, prior to approval of the Order, to comment on or object to it. That, in my view, clearly was error. DeShawn had a right to be present when that Order was considered by the court, even though he could, and apparently did, waive that right. Because he had the *right* to be present, however, under CP § 11–102(a) and CJP § 3–8A–13(f), so did petitioner.

(4) It may be that, in claiming non-documentation of wage loss, the State was relying on petitioner's recovery of compensation from the Criminal Injury Compensation Board, which was asserted later as an independent ground for denying petitioner's motion to reconsider the Consent Order. CP § 11–603(a) permits a court to order restitution if any of six enumerated circumstances exist, one of which is that "(5) the Criminal Injuries Compensation Board paid benefits to a victim." Read alone, that section constitutes a basis for *granting*, not *denying* restitution. It must be read in conjunction with CP § 11–817, however, which provides that acceptance of an award from the Board subrogates the State, to the extent of the award, "to any right or right of action of the claimant or the victim to recover payments on account of losses resulting from the crime or delinquent act with respect to which the award is made, including the right to recover restitution ordered under § 11–603 of this title." Read together, those statutes permit the court to order restitution when there has already been an award by the Board but allows the Board, to the extent of the award, to seek and collect the payment of that restitution if it chooses to exercise its right of subrogation.

I see three problems with the presumed invocation of § 11–817 here. The first is that the State never expressly exercised its right of subrogation. Indeed, as the Board is a State agency within the Department of Public Safety and Correctional Services (*see* CP §§ 11–804(a) and 1–101(f)) and the Attorney General, not any State's Attorney, is the statutory counsel for that Board (*see* Maryland Code, § 6–106(b) of the State Government Article), it would not appear that a prosecutor has any authority to exercise the Board's or the State's subrogation power in any event. The second is that the right subrogated is the right to "recover" restitution. Section 11–817 does not preclude an additional award of restitution any more than it would have precluded the restitution provided for in the Consent Order. It simply would have allowed the State to intercept the payment if it chose to do so. Most important, however, the court did not rely on that prospect as an "extenuating circumstance."

(5) The double jeopardy issue presented by DeShawn and the State is one of first impression in this State.

Both the Federal Constitution, through the Fifth and Fourteenth Amendments, and Maryland common law prohibit the State from placing a person more than once in jeopardy for the same offense. As this Court most recently explained in *Anderson v. State,* 385 Md. 123, 130, 867 A.2d 1040, 1044 (2005), citing *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) and *Purnell v. State,* 375 Md. 678, 827 A.2d 68 (2003), "[t]hat prohibition provides a dual protection—against prosecuting a person for an offense after that person has already been prosecuted for, and either convicted or acquitted of, the 'same offense,' and against imposing multiple punishments for the 'same offense.' "

Although the protection against double jeopardy was intended to apply only to criminal prosecutions and punishments, both the Supreme Court and this Court have made clear that, at least in some settings, it applies in juvenile delinquency proceedings as well, notwithstanding that, in a legal and jurisprudential sense, those proceedings are regarded as civil,

not criminal, in nature. *See In re John P.*, 311 Md. 700, 707, 537 A.2d 263, 267 (1988), citing *Breed v. Jones*, 421 U.S. 519, 529, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346, 355 (1975); *see also In re Mark R.*, 294 Md. 244, 254–55, 449 A.2d 393, 399 (1982); *Parojinog v. State*, 282 Md. 256, 262–63, 384 A.2d 86, 89 (1978).

Most of the double jeopardy applications to delinquency proceedings have involved the sequential prosecution branch of the doctrine. *Breed v. Jones* is illustrative. Based on alleged conduct that would have constituted armed robbery if committed by an adult, a 17–year–old juvenile was charged in a California juvenile court with delinquency. After an adjudicatory hearing, the court found that the allegations in the petition were true and that the child was delinquent. At a subsequent disposition hearing, however, the court determined that the child was not amenable to treatment in the juvenile system and transferred the case to the criminal court, where the child was tried anew for the criminal offense, convicted, and committed to California Youth Authority, which could detain him until age 25.

Noting the gap that had developed between the "originally benign conception" of the juvenile court system and its modern realities, the Supreme Court concluded that a juvenile is, indeed, placed in jeopardy "at a proceeding whose object is to determine whether he has committed acts that violate a criminal law and whose potential consequences include both the stigma inherent in such a determination and the deprivation of liberty for many years." *Breed v. Jones, supra*, 421 U.S. at 529, 95 S.Ct. at 1785, 44 L.Ed.2d at 355. In that regard, the Court observed that, in terms of practical consequences, there was little distinction between the adjudicatory hearing held in that case and a traditional criminal prosecution, and it found, as a consequence, that the juvenile had been placed in jeopardy at the adjudicatory hearing and that he could not lawfully be subjected to a second trial in criminal court for the same offense. *Compare Swisher v. Brady*, 438 U.S. 204, 98 S.Ct. 2699, 57 L.Ed.2d 705 (1978) (holding that State's filing of exceptions to Juvenile Master's findings and

recommendations and resolution of those exceptions by a judge did not violate Double Jeopardy Clause).

*Parojinog* was to the same effect. The defendant, after turning 18, was charged in the Juvenile Court with delinquency based on offenses committed while he was 17. The State asked the court to waive its jurisdiction in favor of prosecution in criminal court. After two hearings on that motion, the court held the matter *sub curia* but, pending another hearing, ordered the defendant to undergo a six-month program of therapy under the supervision of DJS and to pay restitution in the amount of $3,562. Six months later, the court waived its jurisdiction and an indictment was filed against the defendant. On appeal from a denial of his motion to dismiss the indictment, we concluded that the orders issued by the Juvenile Court requiring six months of daily therapy and the payment of restitution were "dispositional in nature" and necessarily "an adjudication that the defendant had committed delinquent acts." *Parojinog v. State, supra,* 282 Md. at 262, 384 A.2d at 89. Accordingly, we held that his prosecution in the criminal court "would subject him to a successive prosecution and to the risk of multiple punishment, in violation of the federal constitutional prohibition against double jeopardy." *Id.* at 265, 384 A.2d at 91. *See also In re Mark R., supra,* 294 Md. 244, 449 A.2d 393 (holding that, where adjudicatory hearing before Juvenile Court master had commenced, two witnesses testified, and master then declared mistrial without juvenile's consent and without manifest necessity, double jeopardy precluded another adjudicatory hearing before a judge).

The double jeopardy context here is not one of successive prosecution after jeopardy has attached but more of whether any increase in the amount of restitution ordered would constitute a prohibited multiple punishment for the same offense. DeShawn and the State, noting holdings from this Court that restitution constitutes a criminal penalty, assert that the "penalty," once imposed, cannot be increased based on the same conduct. That issue was presented to the Court of Special Appeals in *In re Darnell F.,* 71 Md.App. 584, 526 A.2d 971 (1987), *cert. denied,* 311 Md. 144, 532 A.2d 1371

(1987), but the court did not address it, as it had not been raised in the trial court and there appeared to be no factual basis for it in any event.[6]

A judgment of restitution *is* a criminal penalty, when entered in a criminal case. *See Grey v. Allstate, supra,* 363 Md. at 451, 769 A.2d at 895. We have never regarded an order entered in a juvenile delinquency case requiring the *child* to pay restitution as a criminal penalty, however. Such an order, when directed against the child, has always been regarded by us as solely rehabilitative.[7] In *In re Herbert B.,* 303 Md. 419, 427, 494 A.2d 680, 684 (1985), the Court noted that a stated purpose of the Juvenile Causes law was to provide a program of rehabilitation consistent with the child's best interest and protection of the public interest, and that:

> "In concert with this legislative purpose, restitution is rehabilitative in several important respects. For example, restitution impresses upon the child the gravity of harm he has inflicted upon another, and provides an opportunity for him to make amends. In addition, restitution makes the child accountable for his acts by leading him to realize the seriousness of such acts and to accept responsibility for them. *Finally,* an obvious purpose of restitution is that it

---

**6.** In *Darnell F.,* after finding the juvenile to be delinquent, the court scheduled a hearing on the victim's request for restitution. When the prosecutor failed to appear, the court dismissed the request but then reinstated it in response to the prosecutor's motion for reconsideration and ultimately awarded restitution. The juvenile appealed, contending that the court had no revisory authority over restitution orders and that, even if it did, its action violated double jeopardy. The appellate court, in an opinion authored by Judge Bell, now Chief Judge of this Court, held that the Juvenile Court *did* have revisory power and properly exercised it. The double jeopardy issue was not addressed.

**7.** A restitution order entered against a *parent* has been regarded by the Court of Special Appeals as punitive in nature, to the extent that it arises from "a presumed neglect of parental responsibilities." *In re Appeal No. 321,* 24 Md.App. 82, 85, 329 A.2d 113, 114 (1974); *In re Zephrin D., supra,* 69 Md.App. at 761, 519 A.2d at 809, *superseded by statute as stated in In re Jason W.,* 94 Md.App. 731, 619 A.2d 163 (1993), *cert. dismissed,* 332 Md. 509, 632 A.2d 767 (1993); *In re John M.,* 129 Md.App. 165, 174, 741 A.2d 503, 508 (1999).

compensates the victim for the child's delinquent act ... Properly viewed, restitution is beneficial to both the child and the victim."

(Emphasis added). We said nothing there about restitution ordered against a child being intended to punish or being punitive in nature, nor is such an intent articulated in the current language of the statute.

There is another important distinction, beyond the punitive vs. rehabilitative comparison, between an order of restitution entered in a criminal case and one entered against the child in a delinquency case. In a criminal case, a restitution order, unless entered as a condition of probation, is entered as a judgment that becomes part of a criminal sentence. Although Federal double jeopardy principles do not absolutely preclude a criminal sentence from being increased when authorized by statute, see *United States v. DiFrancesco*, 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980), once such a sentence is entered, it is ordinarily final. Except when sentence review is sought by the defendant under CP §§ 8–101 through 8–109, or an appeal is taken by the State under CJP § 12–302 to correct the failure of a court to impose a sentence mandated by law, the sentence may not be increased after it is imposed. The revisory power of the court extends only to modifications that are clarifying in nature or that do not adversely affect the defendant.

That is not entirely the case in delinquency proceedings. Unless the court terminates its jurisdiction earlier, a Juvenile Court retains jurisdiction over a delinquent child until the child reaches 21, CJP § 3–8A–07(a), and it may make appropriate changes to dispositional orders so long as that jurisdiction continues. With two exceptions not relevant here, Maryland Rule 11–116 provides that an order of a Juvenile Court "may be modified or vacated if the court finds that action to be in the best interest of the child or the public." A custody determination may be modified. CJP § 3–8A–24. If the child is committed to an individual or institution, the court may require the custodian to file periodic reports "with recommendations for further supervision, treatment, or rehabilitation."

CJP § 3–8A–25. In a more general way, the court may control the conduct of "a person" properly before the court if it finds that the conduct may be detrimental to the child or to a disposition made or to be made, will tend to defeat execution of an order or disposition made or to be made, or "[w]ill assist in the rehabilitation of or is necessary for the welfare of the child." CJP § 3–8A–26(1).

The Consent Order entered in his case, on its face, reflects the continuing jurisdiction of the court. The last provision of the Order, *just above the signatures of the judge and counsel,* was "All subject to further Order of this Court." There is no double jeopardy violation when such a provision is implemented by the Juvenile Court. In *United States v. DiFrancesco, supra,* 449 U.S. at 137, 101 S.Ct. at 437, 66 L.Ed.2d at 346, the Court made clear that "[t]he Double Jeopardy Clause does not provide the defendant with the right to know at any specific moment in time what the exact limit of his punishment will turn out to be." Continuing, the Court concluded:

> "All this highlights the distinction between acquittals and sentences. *North Carolina v. Pearce* [395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)] and *Bozza v. United States* [330 U.S. 160, 67 S.Ct. 645, 91 L.Ed. 818 (1947)] demonstrate that the Double Jeopardy Clause does not require that a sentence be given a degree of finality that prevents its later increase. Because of the critical difference between an acquittal and a sentence, the acquittal cases ... do not require a contrary result."

*DiFrancesco, supra,* 449 U.S. at 137–38, 101 S.Ct. at 438, 66 L.Ed.2d at 346; *see also Pennsylvania v. Goldhammer,* 474 U.S. 28, 106 S.Ct. 353, 88 L.Ed.2d 183 (1985); *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981).

The Courts of Appeal for the District of Columbia and the Second and Fourth Circuits have interpreted the holding of *DiFrancesco* as permitting a court to reconsider and modify a defendant's sentence when the defendant does not have a reasonable expectation of finality in the sentence. In *United*

*States v. Fogel,* 829 F.2d 77, 87 (D.C.Cir.1987), the court explained:

"[T]he application of the double jeopardy clause to an increase in a sentence turns on the extent and legitimacy of a defendant's expectation of finality in that sentence. If a defendant has a legitimate expectation of finality, then an increase in that sentence is prohibited by the double jeopardy clause. If, however, there is some circumstance which undermines the legitimacy of that expectation, then a court may permissibly increase the sentence."

*See also United States v. Pettus,* 303 F.3d 480, 487–88 (2d Cir.2002) (noting that "[t]he requirement that a defendant only be punished once for a particular crime does not mean that this punishment cannot be modified or extended" and involves "the reasonable expectations of the defendant"); *United States v. Bello,* 767 F.2d 1065, 1070 (4th Cir.1985) ("*DiFrancesco* directs the Court's inquiry to whether the defendant had a legitimate expectation of finality as to the severity of his sentence, in order to determine whether an increase in the sentence is essentially a multiple punishment for the same offense.").

Under this Constitutional umbrella, the statutes noted give the Juvenile Court ample authority to require additional restitution, beyond that provided in the Consent Order, if a case can be made for it, and the Consent Order itself belies any reasonable expectation on the part of DeShawn in its finality. The prohibition against Double Jeopardy did not preclude the Juvenile Court from entertaining petitioner's motion for reconsideration and request for additional restitution.

What all of this reveals to me is that there was no substantive basis for the Circuit Court to deny petitioner's request to challenge the Consent Order that was unlawfully presented to the court and unlawfully signed by the court. Nor can I find any semblance of merit in the Circuit Court's conclusion that petitioner had no standing to seek reconsideration of that Order. When petitioner filed his motion for reconsideration, within five days after being advised of the Consent Order by

the prosecutor, the case was not over. The court retained, and later exercised, its continuing jurisdiction. *Petitioner had the same status when he filed the motion as he had before the Consent Order was signed—a statutory standing to request restitution and to support that request.*

As noted near the beginning of this Concurring Opinion, the issue is not whether Mr. Lopez–Sanchez should receive additional restitution. Had the Circuit Court allowed him to make his argument and then denied the motion for reconsideration on the ground that the restitution provided in the Consent Order was sufficient, that would have ended the matter in a legally appropriate way. What happened here was wrong, however, and, even though this Court is powerless to correct the error, I think it important to make clear that there was, in fact, error—deeply prejudicial error. The Circuit Court held petitioner's timely and properly filed request for restitution for nearly eleven months, then improperly entered an order providing far less than what petitioner requested and the law allows, and then, after holding the matter *sub curia* for an additional ten months, denied petitioner his legislatively-conferred right to support his request.

Judge HARRELL has authorized me to state that he joins in this concurring opinion.